**STATE of Maine**

**v.**

**James G. HACHEY, Jr.**

Supreme Judicial Court of Maine.

June 8, 1971.

**398**

Peter T. Dawson, Asst. Atty. Gen., Augusta, for plaintiff.

Vafiades & Brountas, by Lewis V. Vafiades, Susan R. Kominsky, Bangor, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, WERNICK and ARCHIBALD, JJ.

ARCHIBALD, Justice.

This is an appeal from the Defendant's conviction following a jury trial of the murder of one Harold E. Buzzell. The Defendant, both at trial and on appeal, was considered to be indigent and, therefore, was represented by Court appointed Counsel.

The Indictment, following the suggested form (Form 4) of the Maine Rules of Criminal Procedure, alleged that the Defendant at a stated time and place "did unlawfully and with malice aforethought kill one Harold E. Buzzell." In the brief, for the first time, it was argued that the Indictment was defective for two reasons: 1. The word "willfully" is absent; 2. It is not alleged that Harold E. Buzzell was a human being. There is no merit in either of these contentions. M.R.Crim.P. Rule 58 states: "The forms contained in the Appendix of Forms are sufficient under the rules and are intended to indicate the simplicity and brevity of statement which the rules contemplate." Furthermore, the caption of this Indictment is clear in specifying that the document was an "Indictment for Violation of Title 17, M.R.S.A. Section 2651 (MURDER)". The language of the statute is "Whoever unlawfully kills a human being with malice aforethought, either express or implied, is guilty of murder * * *." Thus, it is clear that the Indictment alleges the elements of the crime and that, by either referring to the statute, or by using common sense, there is no doubt that the charge is for murdering a human being. This conclusion is supported by the authorities, "In general it is unnecessary to allege that the person killed was a human being * * *." 40 C.J.S. Homicide § 145e. In Palmer v. People (Ill.1891) 138 Ill. 356, 28 N.E. 130, interpreting a statute identical to the Maine statute, the Court said, "It need not be averred that the deceased was a human being. The name imports a human being. The language of the indictment and the name applied to the deceased are always used to describe human beings." See also Woods v. Commonwealth (Va.1924) 140 Va. 491, 124 S.E. 458.

The Indictment here does not allege that the act of the Defendant was done "willfully" but does describe the act as being done with malice aforethought. Under these conditions the use of the word "willfully" may be dispensed with since the ex-

pression "malice aforethought" is of like meaning, though more intense, and makes unnecessary the allegation of willfulness. Bishop's New Criminal Procedure, Vol. 3, §§ 543 and 545 (2nd ed.). These points are without merit. Ellis v. State (Me.1971) 277 A.2d 120.

The points of appeal are thus stated:

"1. The Court erred in allowing Trooper William Manduca to give opinion evidence over the Defendant's objection thereto.

"2. The Court erred in admitting the State's exhibits 4, 5 and 6 into evidence over the Defendant's objection thereto.

"3. The Court erred in not granting Defendant's motion for a judgment of acquittal given at the close of the State's evidence.

"4. The Court erred in not granting Defendant's motion for a mistrial made when the State improperly tried to prove that Defendant was previously convicted for intoxication.

"5. The Court erred in not granting Defendant's motion for a judgment of acquittal given at the close of all the evidence.

"6. The verdict is contrary to the weight of the evidence.

"7. The verdict is not supported by substantial evidence.

"8. The Court erred in its charge to the jury.

"9. The jury disregarded the Court's instructions not to discuss the case nor to make judgments until all the evidence was in and instructions received as to law.

"10. The Court erred in overruling Defendant's objections given at various times during the trial."

In order that we may deal intelligently with these issues it is necessary that we summarize the facts disclosed by the rather lengthy record.

Sidney Buzzell, son of the decedent, operated a store in Sangerville. On July 12, 1968 he was in the store, as were his wife and others. At about 6:00 p. m. the Defendant entered the store but, after a brief conversation, left and returned an hour later. He then made some purchases but, stating that he had forgotten his pocketbook, left saying he would return later. He was next seen at approximately 7:30 p. m. when he stopped his red Corvair at the gas pumps and began to fill his gas tank. Sidney Buzzell went out to wait on him and, as requested, got a quart of oil, which he gave to the Defendant. They then entered the store and the Defendant was presented his bill for the previous purchases plus the gas and oil. At this point, Sidney Buzzell was facing the Defendant from behind a counter, being observed by Mrs. Buzzell. The Decedent was standing near a cooler and another person was seated close by.

The Defendant's acts were described by both Sidney Buzzell and his wife in somewhat comparable terms. Mr. Hachey "pulled out a gun" and is quoted as saying, "This is a hold-up" or "stick-up"; "You put money in the bag." Sidney Buzzell said, "Are you serious," to which the Defendant replied, "This is to show I'm serious," and proceeded to fire one shot into a wall of the store at an elevated angle. At this point Harold E. Buzzell apparently made a move in the direction of the Defendant who struck him on the neck and then, as Sidney Buzzell described it, "brought the hand with the gun in it down and shot again and this is when my Dad sort of stumbled backwards." Mrs. Ruth Buzzell was asked this question: "[A]nd you saw the gun pointed toward the abdomen of Harold Buzzell? A. Yes."

Following the shooting, Harold E. Buzzell fell to the floor and his son made an unsuccessful effort to hold the Defendant, who fled from the store, entered his car and drove away. Sidney Buzzell had observed the registration number of the red

Corvair and immediately, by telephone, gave this information to the police agencies.

The Piscataquis Sheriff, James Buzzell, was in the vicinity and, by radio, was given this descriptive information plus the fact that there had been a "hold-up and shooting." Shortly thereafter he observed a car which coincided with the description given him and made an effort to stop it. This was followed by a pursuit over gravel roads at high speeds and ended in the proximity of 8:00 p. m. when the red Corvair went out of control, upset and came to rest on its right side in some bushes. The Sheriff, being alone, stopped his car about 50 feet distant and walked toward the wrecked vehicle, where he observed the Defendant therein. He ordered the Defendant to get out, which he did, after requesting assistance from the Sheriff. The Sheriff then said: "I placed him under arrest and took him back to my car where I had the handcuffs." Shortly a Deputy arrived and the Sheriff, leaving the Defendant with the Deputy, walked back to the red Corvair, looked in and, on the floor, saw "the butt end of a revolver with white handles." A wrecker was called and, when it had righted the Defendant's car, the Sheriff, never having left the scene, opened a door and took out a .22 caliber revolver with a white handle containing four spent shell casings. The Defendant was then taken from this scene to the County Jail.

■ The Defendant participated in filing the brief in this case and raised the issue that the revolver was taken from the car by Sheriff Buzzell "in violation of his constitutional rights under the guarantee of the Fourth and Fourteenth Amendments." The facts clearly indicate that Sheriff Buzzell, at the scene of the arrest and while the Defendant was still present, looked into the vehicle and saw a .22 revolver in plain view. Because of the demolished condition of the car, he could not then remove it and did so only when a wrecker had righted the vehicle. At this time he had knowledge that there had been a serious offense committed and had every valid reason to have placed the Defendant under arrest. The Sheriff was then in a position to see the revolver. It was his plain duty to take it into his possession immediately and, in so doing, violated no constitutional prohibitions. This issue clearly falls within the scope of Harris v. United States (1968) 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067. See also State v. Chapman (Me.1969) 250 A.2d 203; Commonwealth v. Cohen (Mass. 1971) 268 N.E.2d 357.

Meantime, Harold E. Buzzell had been taken to a local doctor for emergency care and then, by ambulance, to the Eastern Maine Medical Center at Bangor. He received surgical treatment from Dr. Lloyd Brown, who described the injury as starting from an abdominal wound just below the ribs in the midline and terminating at the twelfth dorsal vertebrae, in the course of which the liver was lacerated twice and the stomach once, and which had produced a paraplegia of the lower extremities. Four days later this same doctor found it necessary to perform a tracheotomy. In the care of Mr. Buzzell, an internist, Dr. Holzwarth, was used who described Mr. Buzzell as being a person with an enlarged heart, a developing pneumonia and diabetes. A Dr. McEvoy, in Dr. Brown's absence, treated Mr. Buzzell from July 29 until his death on August 2. Dr. Holzwarth testified: "I think he died of infection." He explained that the effect of the bullet passing through the abdomen and the stomach was to create a condition which produced an infection. Dr. McEvoy concurred with this opinion and attributed the sepsis and other conditions resulting in death to the original damage caused by the passage of the bullet through the abdomen.

Dr. Rudolph Eyerer, pathologist, performed an autopsy on the body. He was subject to extensive cross examination but the Jury could have accepted these excerpts from his testimony: "I think the subject did die of infection of the injury received in the abdomen." "The subject died from the effects of the injury which produced, I think, a septicemia or poisoning of the

blood." His conclusion was that but for the bullet wound the secondary conditions would not have developed and Mr. Buzzell would not have died.

■ Dr. Eyerer removed the bullet, noting it had severed the spinal cord, and gave it to a police officer. The Jury had every right to conclude from all the medical testimony in the case that, had this shooting not occurred, Mr. Buzzell would not have died. Certainly they could find that the cause of the septicemia was the entry of the bullet into the body of the decedent. The law is well settled that a Defendant is responsible even where the act was not the immediate cause of death if an intervening cause was the natural result of the wrongful act. State v. Rounds (Vt.1932) 104 Vt. 442, 160 A. 249.

By maintaining proper evidence of continuity, the .22 caliber revolver, 4 spent shells, a bullet taken from the wall of the Buzzell store, and the bullet removed at autopsy were all delivered to William Manduca of the Maine State Police, who is assigned to the Bureau of Identification. He testified that the two slugs had been fired but because of their condition he could not identify the weapon from which they had been fired. He did state that the four spent shells had been fired by the revolver recovered from the Defendant's red Corvair.

■ The Defendant has raised the issue of whether or not Trooper Manduca was sufficiently qualified to give expert testimony in the ballistics field. He was examined thoroughly as to qualification by both the prosecution and defense counsel and the Justice below allowed him to testify. As a result of the testimony, Exhibits 4, 5 and 6 were admitted in evidence. Exhibit 4 was the lead bullet taken from a wall of the Buzzell store, Exhibit 5 was a lead bullet removed from the body at autopsy, and Exhibit 6 was four test shell cases fired from the .22 revolver for comparison with the four empty shell cases found in the revolver by Sheriff Buzzell.

While Trooper Manduca had not had great experience, he had previously testified as an expert in this field. We feel the issues raised both as to his qualifications and to the admissibility of State's Exhibits 4, 5 and 6 were settled in State v. Fitzherbert (Me. 1969) 249 A.2d 760. The Presiding Justice was guilty of no abuse of discretion in determining that Trooper Manduca had the necessary qualifications in the field of ballistics. There was no error of law in his decision. See also State v. Wardwell (1962) 158 Me. 307, 183 A.2d 896.

The Defendant requested psychiatric examination pursuant to 15 M.R.S.A. § 101 et seq., and was given the usual testings, first and preliminarily at the Bangor State Hospital by Dr. John Turner and, on his recommendation, a study was conducted at the Augusta State Hospital under the supervision of Dr. Allan I. Saunders, which lasted approximately six months. Dr. Turner testified for the Defendant and, on the basis of his one examination, expressed an opinion that he suffered from a mental disease, namely, "hysterical dissociative neurosis," a condition "always covered completely or partially by amnesia." He was asked these questions:

"Q [D]o you have any opinion as to whether that act, if it were done, were the results or product of this condition you have just told us about?

"A I believe that this act actually occurred *during* a state of loss of consciousness." (Emphasis added)

\* \* \* \* \* \*

"Q In other words, you believe that this act was the result of this mental problem you found Mr. Hachey to have?

"A *That wasn't what I intended."* (Emphasis added)

The Jury also heard Dr. Saunders who testified as to his prolonged observations of the Defendant. The following excerpts illustrate his conclusions:

"Q And as a result of all these tests, Doctor, was there anything that would

indicate any kind of mental disease or defect?

"A We found no evidence of mental disease or defect during his stay with us."

* * * * * *

"Q Is the conduct which you have just described, the series of related events and facts, consistent with or inconsistent with hysterical disassociation (sic) in your opinion?

"A In my opinion it is inconsistent with the diagnosis hysterical neurosis."

* * * * * *

"Q And was he suffering from any mental defect at the time of the alleged act?

"A No, sir."

* * * * * *

"Q And was he suffering from any mental disease at the time of the alleged unlawful act?

"A No, sir."

The Jury had the right to believe the conclusions of Dr. Saunders. Their options in this regard were carefully explained in the charge of the Presiding Justice and they, obviously, chose to find that the Defendant had failed to maintain his burden in asserting the defense: That the act was the product of either mental disease or mental defect. In fact, the record is devoid of definitive medical evidence that the homicide was the product of either mental illness or defect.

The Defendant was a witness. He described his life to the day of the shooting, but said he did not remember being in Buzzell's store. He does recall borrowing a revolver to go hunting for "baby coons", the weapon being taken to protect himself against the parent coons. This was around "noontime" and the Defendant testified his next recollection was in getting out of the car after the accident. He, therefore, did not dispute the testimony descriptive of the events at the time Mr. Buzzell was shot.

During his cross examination by the County Attorney, who had a so-called "S.B.I." (State Bureau of Identification) sheet in his hand, he was asked whether, on three occasions, he had been convicted of the "crime of intoxication." The Defendant admitted the three episodes but denied the convictions, saying all three cases had been "filed" for various reasons. The County Attorney, in a chambers conference, said: "We are not prepared at this point to prove the convictions by certified copies of the court records." The Defendant moved for a mistrial because "[W]e feel prejudice has been done to this defendant which cannot be cured by a request of the Court to the jury to disregard that portion of the testimony * * *." The Justice below denied the motion and immediately made the following statement to the Jury:

"THE COURT: Members of the jury, up to this point in cross examination of this witness, a number of questions were asked—the door is open, can you hear me? Close the door, please? A number of questions were asked pertaining to convictions for the crime of intoxication. Let me say this to you now. I want you to put—I ordered those questions stricken from the record and instruct you, members of the jury, to put these questions and any answers relating thereto, completely out of your mind. Disregard it. Consider it as not a fact. Pay no attention whatsoever to it. Insofar as the consideration. of the case is concerned, it is as if the questions were never asked and the answers never given. So forget it, it has nothig (sic) to do with the case. There are no such questions or answers in the case from. this point on.

"You may proceed."

We feel that the issue raised by this cross examination of the Defendant is not controlled by a decision as to whether the crime of intoxication involves moral turpitude.[1] Rather, and assuming the impropriety of the questions, the issue presented by the record here is governed by whether or not the Presiding Justice violated the limits of judicial discretion. In State v. Trask, 155 Me. 24, 151 A.2d 280, the Defendant was improperly asked whether he had been convicted of the crime of larceny. The question was not answered and the Presiding Justice, after denying a motion for a mistrial, said this to the Jury, "The Jury will disregard any reference to records of conviction." Exceptions to the denial of the motion were overruled.

■■■ It is noted that the admonition of the Justice below to the Jury went far beyond the approved language in *Trask*. The record clearly indicates that the Justice felt the error could be cured by instructing the Jury to "disregard the whole thing", and he so stated to Counsel in chambers. A motion for mistrial is addressed to the discretion of the Presiding Justice who, being in contact with the trial conditions and circumstances, is peculiarly qualified to render a decision. Such a ruling will not be disturbed in the absence of a clear abuse of discretion, which has not been shown in this case.

The Respondent, at argument, cited State v. Eddington (Ariz.1963) 95 Ariz. 10, 386 P.2d 20 and State v. Stago (Ariz.1957) 82 Ariz. 285, 312 P.2d 160. Assuming that these cases stated the rule in Arizona, which mandates a mistrial unless the prosecutor is prepared and able to prove the truth of a conviction in the event of a denial, we are not prepared to abandon the well established rule in Maine giving the Presiding Justice discretion in such instances.

At the conclusion of the charge the Presiding Justice gave the Jury the possible verdicts, namely: Not guilty; guilty of murder; not guilty by reason of mental disease or defect; guilty of assault, high and aggravated; guilty of assault. The Jury retired at 4:30 p. m. and returned at 5:05 p. m., at which time the Clerk made this inquiry:

"The Clerk: Mr. Foreman, have you agreed upon a verdict?

"The Foreman: We have.

"The Clerk: Mr. Foreman, what say you, is James G. Hachey, Jr., the prisoner at the bar is guilty of what?

"The Foreman: Guilty of murder."

The Court, on his own motion, then directed that the Jury be polled and, on so doing, each of the twelve Jurors responded, "Guilty of Murder". The Defendant did not object to this procedure, nor was there any basis for so doing.

■■■ It was urged that, because the Jury only deliberated for thirty-five minutes in arriving at a verdict, this amounted to a denial of due process. We cannot agree with this. On the basis of the testimony before the Jury and in view of the very clear instructions given them, the issue was not particularly complex. Having obviously accepted the testimony of Dr. Saunders that the Defendant was free of mental disease

---

1. "No person is incompetent to testify in any court or legal proceeding in consequence of having been convicted of an offense, but conviction of a felony, any larceny or any other crime involving moral turpitude may be shown to affect his credibility." 16 M.R.S.A. § 56.

or defect, the record is devoid of any facts or circumstances upon which the Jury in good conscience could reduce this homicide below the grade of murder.

We have examined the complete record with great care, including all rulings to which objections were noted and the instructions given by the Presiding Justice to the Jury. We can find no error. The Presiding Justice would have clearly been derelict in his duty had he granted the motion for acquittal. We are satisfied that not only is there substantial evidence to support the verdict, but also the Jury was justified in finding beyond a reasonable doubt that the Defendant was guilty of murder.

The entry is

Appeal denied.

POMEROY, J., did not sit.