**STATE of Maine**

**v.**

**Gary L. KELLEY.**

Supreme Judicial Court of Maine.

May 26, 1976.

Joseph M. Jabar, Dist. Atty., J. William Batten, Asst. Dist. Atty., Augusta, for plaintiff.

Wathen & Wathen by Jessie H. Briggs, Daniel E. Wathen, Augusta, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DELAHANTY, Justice.

This is an appeal by the defendant, Gary L. Kelley, from his conviction of the crime of rape[1] by a Kennebec County jury. We deny the appeal.

We will consider severally the five errors asserted by the defendant.

### I.

At the close of all the evidence, the defendant moved for a judgment of acquittal, M.R.Crim.P. 29(a), thereby preserving for appellate review the issue of "whether, in view of all the evidence in the case, there was legally sufficient evidence to support the guilty verdict." *State v. Burnham,* Me., 350 A.2d 577, 582 (1976); *State v. Westphal,* Me., 349 A.2d 168, 169 (1975).

The jury could reasonably have found the following material facts:

Kelley was a regular patron at a nightclub in Lewiston where the victim, a young married woman and mother of one child, was employed as a cocktail waitress. On the Saturday night of October 13, 1973, the defendant spent several hours at this nightclub and talked occasionally with the complainant, among others. During the evening, the defendant asked the complainant, who lived in East Monmouth, to drive him to his mobile home in nearby Winthrop. She reluctantly agreed. When the establishment closed shortly after 1:00 a. m. on October 14, the complainant, accompanied by the defendant, undertook the trip home which, for the victim, became an infamous journey.

Except at one point when the defendant attempted to kiss the victim, the drive from Lewiston to Winthrop was uneventful, until the complainant stopped the car by the side of the road so that Kelley could relieve himself. As the defendant got back into the car, he seized the complainant roughly by her hair and throat and tried to kiss her. Following a brief struggle, the complainant escaped from the car and ran away from the road, but the defendant quickly caught her, threw her to the ground and, after he had "stomped" on her head several times told her, while dragging her back to the car, to "shut up or I'll kill you right here."

Kelley assumed control of the car and, restraining the struggling complainant with one hand, proceeded in the direction of Winthrop. He ordered the complainant to "strip," but desisted when she pleaded with him, "Please, I'm married and I have a baby.

1. 17 M.R.S.A. § 3151.

Please don't do this to me. Please, I won't tell. Just let me go." During the thrashing and struggling, the defendant's glasses were knocked to the rear seat of the car. While rummaging in the back seat for the glasses at Kelley's order, the complainant picked up an axe which was lying there and "swung it three times to the back of his head," striking blows with the flat side of the axe-head, which caused Kelley to stop the car. The complainant once again attempted to flee the vehicle, but the defendant grabbed her arm as she was halfway out of the car and held her inside, saying, "Get back in this . . . car or you'll die." Subduing the complainant with his right hand, Kelley drove the remaining distance to his residence.

Upon arriving at Kelley's mobile home, and while he and the complainant were still seated in the car, the defendant confronted his victim with "two choices," namely, sexual intercourse or an unspecified sexual act. The complainant, who feared for her life if she resisted any further, responded, "All right, let's go to your trailer though; not in the car, let's go to your trailer." The defendant pushed the victim into the mobile home and thence into his bedroom, where he demanded that she remove her clothes. She did so, Kelley also undressed and an act of intercourse ensued. Immediately afterwards, as the complainant hurriedly dressed, the defendant threatened her, "[I]f you tell, I won't come after you . . . I'll kill your baby." The time was approximately 2:30 a. m. when the complainant left the defendant's trailer and drove to her home.

When she arrived at her residence, the complainant promptly awakened her husband, who drove his wife directly to the police station in Winthrop where she complained against the defendant. Photographs of the victim taken by a police photographer (State's Exhibits 1 through 11) depict cuts and bruises about the victim's face and head, her torn dress and stockings, and her scraped and bloody right knee. The complainant was taken to the office of a physician who examined her and observed bruises on her neck, chest, hips, and knees, as well as a bruise and swelling in her external genital area, all of which led the doctor to the conclusion that the complainant had recently undergone "forceable sexual intercourse."

Kelley was arrested and charged with rape later in the day on October 14.

■ We thus see that there was ample credible evidence of the defendant's criminal conduct to warrant the jury verdict that the defendant compelled the complainant to have sexual intercourse with him by inflicting physical force on her during the trip from Lewiston to Winthrop and by threatening her with further violence unless she succumbed.[2] Although the complainant offered no physical resistance to the act of intercourse itself, it is evident that she was subjected to a series of violent physical attacks made upon her by the defendant, and that she submitted to the defendant's demands only because she feared for her life if she did otherwise. On its facts, this case closely resembles *State v. Carlson,* Me., 308 A.2d 294 (1973), where we observed that "[T]he evidence permits no other rational conclusion than that the defendant overcame the will of the complainant by violent force and threat of death and compelled her to have sexual intercourse with him," and held "These acts are punishable as rape." *Id.* at 296.

2. The defendant mistakenly claims that the complainant's testimony regarding the occurrence of the rape was "uncorroborated." To the contrary, the victim's assertions were corroborated by medical testimony, by photographic evidence, and by the testimony of several disinterested observers who witnessed the complainant's physical condition shortly after the incident took place. In any event, we reiterate that "Corroboration is not necessary for a rape conviction, though its presence necessarily lends greater credence to the victim's claims." *State v. Worrey,* Me., 322 A.2d 73, 78, n. 3 (1974).

The defendant appeared on his own behalf and, not unsurprisingly, gave an exculpatory account of the events of the night of October 13 and the early morning of October 14, the basic thrust of which was that the complainant voluntarily engaged in sexual intercourse with him. Kelley denied ever threatening or striking the victim. This Court is ever mindful that "In judging the sufficiency of the evidence we do not sit to retry the case and substitute our impressions of the facts for those of the jurors." *State v. Worrey*, Me., 322 A.2d 73, 77 (1974). It is the province of the trier-of-fact to assess the credibility of witnesses and the weight to be attached to their testimony. *State v. Bonney*, Me., 351 A.2d 107, 110 (1976); *State v. Gagne*, Me., 349 A.2d 193, 198 (1975). The jury's verdict indicates that it deemed the defendant's testimony unworthy of belief and, as we have pointed out, there was substantial credible evidence presented which warranted the jury in finding Kelley guilty of rape beyond a reasonable doubt. The motion for a judgment of acquittal was thus correctly denied.

## II.

The defendant disputes two evidentiary rulings made by the presiding Justice during the State's direct examination of the complainant.

In the first instance, after the prosecutrix had testified that the defendant had given her "two choices" and that she had responded by saying "All right, let's go to your trailer though; not in the car, let's go to your trailer," the State's attorney asked, "Now why did you say that?" Over the general objection[3] of the defendant, the complainant was permitted to give the following answer:

There were two reasons. Number one was that perhaps somebody would be awake walking a dog around. Maybe I could get help. Or the other was that maybe if I let him have his way, he'd let me live. It would be very difficult to leave a dead body in your own trailer.

The second ruling contested by the defendant occurred after the complainant testified that, as she was leaving Kelley's trailer, she asked the defendant, who was naked, to walk her to the door, kissed him on the cheek, and said, "I'll see you Monday night." The State's attorney then asked, "Now, this business of suggesting that he walk you to the door and the language that was used; why did you say those things?" Over another general objection by the defendant, the complainant responded,

Well, again, just in case he decided to change his mind and kill me. There were two reasons. Number one, even at a time like that, somebody will think twice before walking out of their house with no clothes on. And number two, if he walked me to the door next to me, he couldn't jump me from behind if he decided to do so.

The defendant argues that the presiding Justice erred by permitting the complainant to so explain her conduct. We disagree. M.R.Crim.P. 51 requires that a party who opposes the admission of certain evidence make known to the court "his objection to the action of the court *and his grounds therefore . . . .*" (Emphasis added.) As we have pointed out, the defendant interposed two purely general objections to the testimony of which he now complains, and thereby failed to comply with Rule 51. It is a well-nigh universal principle that "The overruling of a general objection preserves nothing for review unless it clearly appears that the evidence was inadmissible for any purpose whatsoever." H. Glassman, 3 Maine Practice 425 (1967). McCormick on Evidence 115 (E. Cleary ed. 1972); 1 Wigmore on Evidence 332 (3d ed.

---

3. The objection was merely "general" because the defendant failed to specify any grounds therefore.

1940); M.R.Ev. 103(a)(1) (effective February 2, 1976). Our task as an appellate court, therefore, is to scrutinize the record to ascertain whether there was any tenable ground for admitting the evidence in question.

■ We find that the explanatory testimony given by the complainant regarding her behavior immediately before and immediately after the crime was probative on the crucial issue at trial, namely, whether the act of intercourse was "against [the] will" of the complainant. 17 M.R.S.A. § 3151. The statutory language "against her will" has the same meaning as "without her consent." *State v. Dipietrantonio*, 152 Me. 41, 46, 122 A.2d 414, 417 (1956). The limited questions asked by the State's attorney to which the defendant unsuccessfully objected have an obvious bearing on the issue of consent. See *Carlson*, supra, 308 A.2d at 295–96, where questions of a similar import were asked the complainant in a rape case. We accordingly hold that the evidence in question was relevant and not otherwise inadmissible. As we have said many times, "The relevance of evidence is a determination which is left to the discretion of the presiding Justice." *Westphal*, supra, 349 A.2d at 171. We discern no abuse of discretion here.

### III.

The complainant's husband was called as a witness by the State. On cross-examination, the witness was permitted to testify, over the State's objection, that, accompanied by his wife and their infant child, he had gone to the defendant's mobile home "very early in the morning" on October 14, 1973, and was there for "two minutes, maybe three minutes." On redirect examination, the State established that this occurred *after* the complainant and her husband had been to the police station to report the alleged rape. The following exchange then ensued:

MR. MARDEN: Why did you go there?

MR. LIPMAN: Objection.

THE COURT: State the basis of your objection.

MR. LIPMAN: Calls for an opinion.

THE COURT: Well, it may and it may not. I think he can give us his reason for going there. I'll overrule it. Depending on what the answer is, you may object to the answer. It's hard to rule on all possible answers there might be. But the question itself is admissible.

THE WITNESS: I went there because Kelley had threatened to kill my baby and my wife if she went to the police. Should I go through exactly what happened?

MR. MARDEN: No. Just in light of those circumstances, what you've said, why did you go there?

THE WITNESS: To warn him not to come even within shouting distance of my wife and baby.

MR. MARDEN: All right. And did you communicate that to him?

THE WITNESS: Yes, sir.

MR. MARDEN: No further questions.

The defendant moved for a mistrial at this juncture, urging that "[T]he response to that question as to why he went there put in evidence before the jury certain hearsay evidence as to what his wife obviously told him which was previously inadmissible. And, I think this evidence is highly prejudicial . . . ." The court denied the motion for a mistrial.

■ On appeal, the defendant argues that the trial court erred by not granting his mistrial motion, since the witness's answer to the question "Why did you go there?", was "prejudicial hearsay." We find this argument entirely unpersuasive.

Assuming, *arguendo*, that the witness's statement, "I went there because Kelley had threatened to kill my baby and my wife if she went to the police," did contain hearsay evidence, the defendant did not move that this testimony be stricken from the record or that the jury be instructed to disregard it. Instead, he chose to move for a mistrial. Such a motion is addressed to the sound discretion of the trial court, *State v. Coombs*, Me., 351 A.2d 122, 124 (1976); *State v. Hachey*, Me., 278 A.2d 397, 403 (1971), and should be granted only in the event that no remedial measure short of a new trial will satisfy the interests of justice. *Gagne,* supra, 349 A.2d at 198. The defendant has made no showing either at trial or on appeal that he was so prejudiced by the admission of this testimony that a mistrial was mandated.

█ Contrary to the defendant's assertion at trial that evidence of threats made by Kelley was "previously inadmissible," the complainant had previously testified that the defendant had threatened at least twice to kill her and once to kill her baby. Moreover, before the complainant's husband had taken the stand, the defendant himself had introduced, during cross-examination of the complainant, Defendant's Exhibit 1, a signed statement made by the complainant at the police station that contained numerous references to threats against her life made by Kelley during the trip from Lewiston to Winthrop and in the defendant's trailer. The statement by the complainant's husband, "I went there because Kelley had threatened to kill my baby and my wife if she went to the police," was thus merely cumulative of facts already in evidence. The jurors learned

nothing from this particular testimony that they did not already know. In these circumstances, we perceive no reasonable possibility that the defendant was prejudiced by the admission of this evidence. See *State v. McCarthy*, Me., 355 A.2d 923, 925 (1976). The motion for a mistrial was correctly denied.[4]

## IV.

The trial of this case began on Thursday, March 14, 1974 and continued, with a weekend recess, through Monday, March 18, 1974. After the court convened on the morning of March 18, the presiding Justice, at the request of the defendant's counsel, inquired of the jurors whether any of them had "seen a program on a local news television program yesterday, about five minutes of it, where people were discussing their views on rape cases." The Justice added, "[C]ounsel feel some very broad and perhaps unwanted (sic) conclusions were drawn in that program . . . ."[5] Two of the jurors replied that they had seen such a news item.[6] In response to further questioning by the court, one of the two acknowledged that she had watched the program "all the way through," while the other juror explained that he had switched the program off when he realized that the subject matter was rape. Addressing himself to these two jurors, the Justice continued,

Now I didn't see this program. I have really very little to go on, just what has been reported to me in general terms, but it has been reported, as I indicated earlier this morning, that people were expressing themselves concerning rape matters with a great deal more certainty

---

4. The defendant's argument is limited to the denial of his motion for a mistrial. He does not contend that the court's overruling of his objection to the question, "Why did you go there?", was error. Nor does he argue that the witness's statement, "I went there because Kelley had threatened to kill my baby and my wife if she went to the police," should have been *excluded* as hearsay.

5. The court's attention was apparently called to this matter in an off-the-record discussion with the State's attorney, who had himself seen the program in question, and the defendant's attorney, who had not.

6. The court subsequently determined that none of the other jurors were aware that such a program had been broadcast.

than anyone in this world has a right to express. Perhaps the statistics were bandied about without any foundation. Certainly the ones reported to me would not seem to be accurate.

Now do you think, listening or being exposed to that type of somewhat irresponsible talk, do you think that you can still decide this case solely on the evidence that's been presented on this witness stand and exhibits that have been introduced and on the law that I am going to give you later on today? [7]

Both jurors gave affirmative answers to the court's question.

The defendant's counsel then asserted in a conference at the bench that "I was advised by people who did see the show that one particular witness stated . . . authoritatively that of all the cases, only 2% of the time when someone claims they (sic) were raped was . . . the report . . . false, leaving the impression that 90% of the times that people were charged with rape, that it is true," and, the results of the court's voir dire notwithstanding, moved for a mistrial "based upon the show, and the fact that the jury now, two members, have been subject to such an improper factual figure that was given to them in that show and the nature of the show was, just from what I know, a very inflammatory show."

The court observed that the State's attorney "is the only one here who saw [the program]," and requested him to "talk more authoritatively" about its contents. The State's attorney's response, made out of the hearing of the jury, was as follows:

I don't mean to imply that the show was in any way inflammatory. The premise of the feature article was the women who are raped, number one, have a tendency not to go to the police because they don't feel they are properly treated by the police; and, secondly, they have a strong emotional problem getting over it. And this was simply a reporting of a group of women in the Philadelphia area who are trying to do something about it just as they are here in Augusta, which has been in the news lately.

I can't conceive of anything concerning the program as a whole that would be influential. The only thing I mentioned to the court was this bland statement in response to whether this women's organization is fostering the wrongful accusations was a response by the leaders saying statistics have shown that only 2% of the cases of men charged with rape were unfounded. And then the program immediately went on with something else.

At this point, the court concluded,

Well, from the answers I have gotten so far from the two jurors, one seeing part of it, I think they are still impartial jurors to decide the question in this case solely on the evidence and the law given to them. So I am not going to grant a mistrial on that, because they have convinced me that they are still fair jurors.

■ The defendant argues that the court abused its discretion by denying his motion for a mistrial. He reasons that the *potential* for jury contamination as a consequence of the exposure of the two jurors to the television documentary in question was so great that a mistrial was necessary.[8] We disagree. The issue before the court

---

7. We note that the court's comment to the jury had the direct effect of a cautionary instruction that they give no heed to any matter other than the evidence produced at trial and the court's instructions on the law.

8. Although we recognize that occasions may arise when a juror is exposed to information of a character so patently damaging to the defendant that prejudice ought to be, in effect, conclusively presumed, and a mistrial granted, regardless of any testimony by the juror as to his continued impartiality, this case does not present such an extreme situation. Compare *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *United States v. Concepion Cueto*, 515 F.2d 160, 163–64 (1st Cir. 1975); *United States*

was whether the defendant was prejudiced because two jurors inadvertently witnessed a brief television documentary on the general subject of rape. This is precisely the sort of question which should be left to the discretion of the presiding Justice, who is in the best position to assess the effect of such an incident. *Gagne,* supra, 349 A.2d at 198.[9] The Justice here investigated the matter thoroughly and concluded that the defendant had not been prejudiced. We are unable to find, nor has the defendant directed us to the slightest bit of evidence that the court abused its discretion when it denied the motion for a mistrial and, in the absence of such a showing, the ruling will stand. *McCarthy,* supra, 355 A.2d at 925; *Hachey,* supra, 278 A.2d at 403.

### V.

On September 13, 1974, Kelley filed a motion for a new trial on the ground of newly discovered evidence.[10] The motion asserted that "[A] statement allegedly made by the defendant during a trial recess was improperly and illegally reported to certain members of the jury and that the same was discussed by certain members of the jury during the trial and before the close of all the evidence." At the hearing on this motion on November 25, 1974, the defendant called five of the jurors who sat at his trial. Each of these witnesses testified that, during a luncheon recess in the course of the trial, she had heard an unidentified female juror make a remark to the effect that, "Mr. Kelley says that he has nothing to worry about because the jury is falling asleep."[11] It was stipulated that none of the other seven jurors heard any such remark.

The court denied Kelley's motion for a new trial by brief written order.

A showing that extraneous, potentially prejudicial information was brought to the attention of one or more jurors during a trial creates a presumption that the resultant verdict was thereby affected. *Simmons v. State,* Me., 222 A.2d 366, 370 (1966); *State v. Duguay,* 158 Me. 61, 67–68, 178 A.2d 129, 132 (1962); *Driscoll v. Gatcomb,* 112 Me. 289, 290, 92 A. 39 (1914). The uncontested evidence adduced by the defendant at the hearing that five jurors were led to believe that Kelley made a remark such as that which was attributed to him by an unidentified juror was sufficient to give rise to such a presumption of prejudice.

The inquiry before the court in these circumstances is whether there is a reasonable possibility that the receipt of the extraneous information by the jurors affected the guilty verdict. See *United States v. Howard,* 506 F.2d 865, 869 (5th Cir. 1975). Prejudice to the defendant will

---

*v. Solomon,* 422 F.2d 1110, 1117–19 (7th Cir. 1970), cert. denied sub nom. *Sommer v. United States,* 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565 (1970).

9. We merely add the following observation: jurors, as well as the rest of us, are exposed daily to sources of information such as newspapers, radios and televisions. Absent a strict pretrial sequestration order, it is unrealistic to expect that jurors completely isolate themselves from such worldly intrusions. Justice does not require that a juror take up residence in a vacuum during his term of service. The relevant inquiry upon the disclosure that a juror has been exposed to potentially prejudicial extraneous information is whether the fairness of the defendant's trial has in fact been compromised.

10. M.R.Crim.P. 33 provides that a motion for a new trial on the ground of newly discovered evidence is timely if made within two years after final judgment. In a case such as this one, where the defendant's appeal was pending at the time he filed the motion, the appeal is held in abeyance until the Superior Court has acted on the motion.

11. There is nothing in the record which indicates that the defendant in fact made, or did not make, such a comment. The five jurors were in agreement, nonetheless, that a comment of this nature was attributed to Kelley by an unidentified member of the jury.

be *presumed* in the absence of "clear and convincing proof," *Duquay,* supra, 158 Me. at 69, 178 A.2d at 133, negating the existence of such a possibility. In making its determination, the court must disregard testimony from the jurors as to whether they were in fact influenced by the extraneous information, because of the long-standing and time-honored rule that "[T]he testimony of a juror is not available to impeach a verdict in which he participated." *Patterson v. Rossignol,* Me., 245 A.2d 852, 856 (1968). *Driscoll,* supra, 112 Me. at 290, 92 A. at 39; M.R.Ev. 606(b) (effective February 2, 1976). A jury member is permitted to testify, however, "to any facts bearing upon the question of existence of an outside influence upon the jury . . . ." *Patterson,* supra.

 In the instant case, there was clear and convincing evidence to warrant the court in concluding that there was no reasonable possibility that the defendant was prejudiced. The court could have reasonably found that the allegedly damaging comment was related to the five jurors during a luncheon recess on the first day of a trial beginning on a Thursday and ending on the following Monday; that the comment was "discussed"—if at all—only momentarily on that same Thursday, and never thereafter; and that the comment was not mentioned during the jury's deliberations. A motion for a new trial on the ground of newly discovered evidence is ultimately addressed to the court's discretion, *State v. McDonough,* Me., 350 A.2d 556, 560-61 (1976), and we are completely satisfied that, in the circumstances of this case, the presiding Justice properly exercised his discretion by denying Kelley's motion for a second trial.[12] As we said in *Duguay,* supra, 158 Me. at 67, 178 A.2d at 132, "The maintenance of purity in the conduct of a trial does not compel the discard of common sense."

The entry is:

Appeal denied.

All Justices concurring.

WEATHERBEE, J., joined in this opinion but died before certification.

---

12. As the defendant points out, each of the five jurors was permitted to testify in so many words that she was not influenced by the comment. The admission of this evidence was error under the exclusionary rule reiterated in *Patterson v. Rossignol,* Me., 245 A.2d 852, 856 (1968). The defendant, however, made no objection to this testimony at the hearing and, in view of the ample, properly admitted evidence available to rebut the presumption of prejudice and support the court's denial of Kelley's motion, we conclude that the error was not an "obvious error" which affected "substantial rights" of the defendant. M.R.Crim.P. 52(b).