Francis POULIN

v.

**COLBY COLLEGE and Maine Bonding & Casualty Co.**

Supreme Judicial Court of Maine.

June 6, 1979.

Joseph M. Jabar, (orally), John P. Jabar, Waterville, for plaintiff.

Vernon I. Arey, (orally), Clyde L. Wheeler, Waterville, for defendants.

Before POMEROY, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

POMEROY, Justice.

Following a three-day jury trial in the Superior Court, Kennebec County, plaintiff Francis Poulin was awarded damages for injuries he sustained in a fall on the campus of Colby College. Prior to trial, defendant had unsuccessfully moved for summary judgment. Subsequent motions for a directed verdict and for a judgment notwithstanding the verdict, or in the alternative a new trial, were likewise denied. It is from the order denying the latter motion that defendant now appeals.[1]

We deny the appeal.

Taking the evidence in the light most favorable to plaintiff, *Quinn v. Moore*, Me., 292 A.2d 846 (1972), the jury would have been entitled to find the following facts. On January 3, 1973, plaintiff accepted a ride to work with a Mr. and Mrs. Tulley. Both Mr. Tulley and plaintiff were employed at the Scott Paper Company in Winslow. The plan for that particular morning was to drop Mrs. Tulley at Colby College in Waterville, where she was employed as a dormitory maid, before proceeding to Winslow. Upon arriving at the Colby College campus, Mr. Tulley attempted to negotiate

the hill in front of the dormitory in which Mrs. Tulley worked. Due to the icy road conditions, however, the car was unable to make it up the incline. Plaintiff got out of the car and, apparently without any prior request from Mrs. Tulley, proceeded to help her up the shoulder of the roadway opposite the dormitory. After making sure that she was safely on the dormitory steps, plaintiff attempted to re-cross the icy road and regain his footing on the shoulder. He had only taken two or three steps, when he fell and slid down the hill, incurring the injuries that gave rise to this action.

## I. Landowner's Duty of Care

Up to this point, the duty owed by a landowner to one lawfully on his land was determined by the latter's legal status. To invitees—those persons present on the land through an owner's express or implied invitation, either for a purpose connected with the owner's business,[2] or for a social visit[3] —the landowner owed the positive duty of exercising reasonable care in providing reasonably safe premises for their use. *See Isaacson v. Husson College*, Me., 297 A.2d 98 (1972); *Orr v. First National Stores*, Me., 280 A.2d 785 (1971). To licensees—persons who are neither passengers, servants, nor trespassers, and do not stand in any contractual relation with the owner of the premises, and are permitted to come upon the premises for their own interest, convenience or gratification, *Patten v. Bartlett*, 111 Me. 409, 89 A. 375 (1914)—however, the landowner owed only the duty of refraining from wilfully, wantonly or recklessly causing him harm. *See Meserve v. Allen Storage Warehouse Co.*, 159 Me. 128, 189 A.2d 381 (1963).

1. We take this opportunity to note that although defendant purports to appeal from the order denying the motion for judgment notwithstanding the verdict, or in the alternative a new trial, the appeal is one from the judgment entered on the verdict and encompasses all errors otherwise properly preserved. *See Duguay v. Pomerleau*, Me., 299 A.2d 914 (1973); Rule 73(a), M.R.Civ.P.; 2 Field, McKusick and Wroth, *Maine Civil Practice*, § 73.8 (Supp. 1977).

2. *But see, Orr v. First National Stores, Inc.*, Me., 280 A.2d 785, 789 at n. 3, where we noted the expanded definition of invitee adopted by the *Restatement (Second) of Torts*, § 332 (1965). Given the factual context of this case we need not address the relevance of the Restatement's expanded definition.

3. The historical distinction between social and business invitees was abolished by 14 M.R.S.A. § 159 (Supp.1978).

In the instant case, the presiding Justice, after first defining the duty owed the various classes of persons, properly left the determination of plaintiff's legal status to the jury. *See Shaw v. Piel*, 139 Me. 57, 27 A.2d 137 (1942); *Martin v. Eldridge*, 123 Me. 569, 124 A. 73 (1924). The jury returned a specific finding that plaintiff was an invitee at the time of the accident. That finding will not be disturbed absent a showing that it lacks credible evidence to support it. *General Motors Acceptance Corp. v. Anacone*, 160 Me. 53, 197 A.2d 506 (1964).

There can be no gainsaying that Mrs. Tulley was an invitee on January 3. She was present on the campus at the express behest of defendant for a purpose integrally connected with its business. Defendant, therefore, was obligated to exercise reasonable care in providing her with premises that were reasonably safe for her use. *Isaacson v. Husson College, supra; Orr v. First National Stores, supra.* Notwithstanding that duty, defendant argues that because plaintiff *gratuitously* aided Mrs. Tulley and was not on the campus for any business purpose, he was at best a mere licensee.

Given the condition of the roadway, of which defendant must have been aware, defendant must have know that Mrs. Tulley would be exposed to great danger by attempting to reach the dormitory. It was therefore foreseeable, in light of the relationship between plaintiff and Mrs. Tulley, i. e., fellow passengers in the automobile taking Mrs. Tulley to work, that plaintiff would alight from the vehicle and aid Mrs. Tulley up the hill. By his conduct, plaintiff enabled one of defendant's employees to reach her place of employment, thereby conferring, at least to some degree, an economic benefit upon defendant. An invitation for plaintiff to enter upon defendant's premises is reasonably implied from such circumstances.

We see the facts in this case as not dissimilar from those in *Hutchins v. Penobscot Bay and River Steamboat Co.*, 110 Me. 369, 86 A. 250 (1913) and *Tobin v. Portland, Saco and Portsmouth Railroad*, 59 Me. 183, 8 A.R. 415 (1871). In *Hutchins*, our Court found an implied invitation from the foreseeability of a mother, herself not a passenger, accompanying her daughter, who was a passenger, onto defendant common carrier's premises. Likewise, in *Tobin*, an implied invitation was found where a hackman was injured while aiding a passenger from his taxi onto the defendant railroad's platform.

As will hereinafter appear, it becomes unnecessary for us to bottom our decision that the appeal must be denied on the conclusion reached by the jury that plaintiff was an invitee. We take this occasion to redefine the duty owed to one who is lawfully on the premises of another without respect to his status as an invitee or a licensee.

In carefully reviewing respective counsels' briefs, as well as conducting our own research, we are once again confronted with the minute distinctions that are often espoused by both the parties and the courts in their attempts to deal with the obligations owed by landowners to the various classes of persons legally on their lands. In response to this growing confusion, a number of jurisdictions have abandoned the distinction between invitees and licensees, turning instead to a unitary standard that would impose on a landowner a duty of reasonable care in all the circumstances to those lawfully on the premises. *See Smith v. Arbaugh's Restaurant*, 152 U.S.App.D.C. 86, 469 F.2d 97 (1972); *Levine v. Katz*, 132 U.S.App.D.C. 173, 407 F.2d 303 (1968) (Bazelon, C. J., concurring); *Rowland v. Christian*, 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496 (1968); *Mile High Fence Co. v. Radovich*, 175 Colo. 537, 489 P.2d 308 (1971); *Pickard v. City and County of Honolulu*, 51 Haw. 134, 452 P.2d 445 (1969); *Rosenau v. City of Estherville*, Iowa, 199 N.W.2d 125 (1972); *Mounsey v. Ellard*, 363 Mass. 693, 297 N.E.2d 43 (1973); *Peterson v. Balach*, 294 Minn. 161, 199 N.W.2d 639 (1972); *Mariorenzi v. Joseph DiPonte, Inc.*, 114 R.I. 294, 333 A.2d 127 (1975); *see also, Sargent v. Ross*, 113 N.H. 388, 308 A.2d 528 (1973); *Annot.*, 32 ALR 3d 508 (1970). The justification for aban-

doning the historical common law distinctions between invitees and licensees is found in the evolution of our society from a culture centered on the land to one grounded in an urban, industrialized setting. The United States Supreme Court noted this evolution when it refused to incorporate the invitee-licensee distinction into admiralty law.

> The distinctions which the common law draws between licensee and invitee were inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism. In an effort to do justice in an industrialized urban society, with its complex economic and individual relationships, modern common-law courts have found it necessary to formulate increasingly subtle verbal refinements, to create subclassifications among traditional common-law categories, and to delineate fine gradations in the standards of care which the landowner owes to each. Yet within a single jurisdiction, the classifications and subclassifications bred by the common law have produced confusion and conflict. . . . Through this semantic morass the common law has moved, unevenly and with hesitation, towards "imposing on owners and occupiers a single duty of reasonable care in all the circumstances." (citations and footnotes omitted).

*Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630–31, 79 S.Ct. 406, 410, 3 L.Ed.2d 550 (1959). The Massachusetts Supreme Judicial Court echoed similar sentiments in *Mounsey v. Ellard, supra,*

> It no longer makes any sense to predicate the landowner's duty solely on the status of the injured party as either a licensee or invitee. Perhaps, in a rural society with sparse land settlements and large estates, it would have been unduly burdensome to obligate the owner to inspect and maintain distant holdings for a class of entrants who were using the property "for their own convenience," but

> the special immunity which the licensee rule affords landowners cannot be justified in an urban industrialized society. We can no longer follow this ancient and largely discredited common law distinction which favors the free use of property without due regard to the personal safety of those individuals who have heretofore been classified as licensees. (Citations and footnotes omitted)

363 Mass. at 706–707, 297 N.E.2d at 51.

A further justification for abolishing the common law distinctions was set forth in *Rowland v. Christian, supra.* Therein, the California Supreme Court, in erasing *all* distinctions between persons entering onto lands of another, stated:

> A man's life or limb does not become less worthy of protection by the law nor a loss less worthy of compensation under the law because he has come upon the land of another without permission or with permission but without a business purpose. Reasonable people do not ordinarily vary their conduct depending upon such matters, and to focus upon the status of the injured party as a trespasser, licensee, or invitee in order to determine the question whether the landowner has a duty of care, is contrary to our modern social mores and humanitarian values. The common law rules obscure rather than illuminate the proper considerations which should govern determination of the question of duty.

70 Cal.Rptr. at 104, 443 P.2d at 568.

Although we have not found the level of confusion in Maine commensurate with that which obviously distressed both the United States Supreme Court, *see Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. at 631, n. 7, 79 S.Ct. 406, and the Massachusetts Supreme Judicial Court, *see Mounsey v. Ellard, supra*, 363 Mass. at 703–705, 297 N.E.2d 43, the reasoning underlying those courts' opinions is equally valid here.[4] We can find no reason for denying a

---

4. Our cases are not without some confusion, however. Illustrative of such confusion is the holding in *Shaw v. Piel*, 139 Me. 57, 27 A.2d 137 (1942). Therein, our Court held that a person entering upon land not occupied as a general place of business, is a mere licensee until the occupier or his representative expresses a willingness to discuss, consider, or negoti-

plaintiff the opportunity to recover damages for injuries sustained due to the negligence of a landowner merely because the former was a licensee and not an invitee. This is especially so in situations where the burden is no greater on the landowner to exercise reasonable care in providing reasonably safe premises for licensees than for invitees. We, therefore hold, as have those jurisdictions noted above, that an owner or occupier of land owes the same duty of reasonable care in all the circumstances to all persons lawfully on the land. This does not require an owner or occupier to insure the safety of his lawful visitors. Rather it merely extends the protection previously afforded invitees to those persons who had heretofore been classified as licensees.[5]

Due to the nature of our decision and the effect it may have on landowners as a class, we limit application of our holding abolishing the distinction between licensees and invitees to this case and those involving injuries occurring on or after January 3, 1973, the date of the injury at issue herein. See Jones v. Billings, Me., 289 A.2d 39, 43 (1972).

## II. Plaintiff's Negligence

■ Notwithstanding its own negligence, defendant argues that plaintiff, by proceeding along a roadway he knew to be icy, was causally negligent, thus rendering erroneous the jury verdict absolving plaintiff of any comparative fault. Therefore,

defendant argues, the trial Justice should have granted its motion for judgment notwithstanding the verdict or in the alternative, a new trial.

In assessing defendant's argument, we are guided by the principle that a defendant must bear the burden of proving by a preponderance of the evidence that an injured plaintiff was causally negligent. Crocker v. Coombs, Me., 328 A.2d 389 (1974). Furthermore, the determination of such negligence is a matter exclusively for the jury, Ferguson v. Bretton, Me., 375 A.2d 225 (1977), and its finding will not be set aside unless clearly erroneous. General Motors Acceptance Corp. v. Anacone, supra.

Both plaintiff and defendant correctly cite Isaacson v. Husson College, supra, as the controlling law. Therein, we held that a college student, to whom the college owed a duty of reasonable care, could not be precluded from recovering damages for injuries sustained in a fall on an icy sidewalk, despite his knowledge of the dangerous condition thereof, when the college should have foreseen that a reasonable person would have proceeded despite such knowledge. See also, Restatement (Second) of Torts, § 343A (1965), and comments thereafter, and Ferguson v. Bretton, supra. In the instant case, we are unable to say, as a matter of law, that defendant should not be charged with the knowledge that one of its employees would choose to encounter a slip-

ate with him respecting matters of common interest, at which time he becomes an invitee. Such a holding presents the possibility that a person injured walking up to the front door of a building "not occupied as a general place of business" will not be able to recover for injuries sustained due to the negligence of the owner; whereas, the same person, given an intervening discussion with the owner concerning "matters of common interest", may recover for similar injuries incurred leaving the front door. We can find scant justification for providing an owner such insulation in today's society.

5. Unlike the Court in Rowland v. Christian, supra, we limit our holding to invitees and licensees. We are unconvinced that the status of trespasser fails to carry continued significance in our modern society. Whereas both invitees and licensees enter another's lands under color of right, a trespasser has no basis for

claiming extended protection. There remains the possibility that the abandonment of the status of trespasser would place an unfair burden on a landowner who has no reason to expect a trespasser's presence. Accord, Mounsey v. Ellard, supra, 363 Mass. at 707, n. 7, 297 N.E.2d 43.

Our opinion today in no way alters our holding in Jones v. Billings, supra. Therein, we adopted section 339, Restatement (Second) of Torts (1965), which recognizes the right of a child trespasser to recover for injuries sustained as a result of a landowner's failure to exercise reasonable care to protect against dangerous conditions which "involve an unreasonable risk of death or serious bodily harm." 289 A.2d at 43. As we noted in Jones, that duty is not the same as the duty heretofore owed to invitees.

pery hill in an attempt to reach her place of employment. Nor are we willing to say that it was unreasonable for plaintiff to offer his assistance in such an effort and that defendant should not have foreseen such aid being given. Finally, defendant's position is weakened by the fact that both plaintiff and Mrs. Tulley attempted to guard themselves against the possibility of falling by ascending the steep roadway on its shoulder, rather than on its allegedly more slippery center.

Even assuming the reasonableness of plaintiff's original undertaking, defendant argues that the jury's verdict is erroneous because plaintiff, by his own account, was travelling down the center of the roadway at the time he fell. Presupposing purely for the sake of argument that such a fact, if undisputed was sufficient to cast doubt on the jury's verdict, defendant still cannot prevail. Mrs. Tulley, in her testimony, clearly stated that plaintiff was re-crossing the roadway when he fell. A careful review of plaintiff's testimony, in light of Mrs. Tulley's, creates some ambiguity as to whether plaintiff meant he was descending the hill in the center of the roadway, or was re-crossing it and fell in the middle. In any event, the ambiguity raised by the potentially conflicting testimony presented a classic jury question that was resolved in plaintiff's favor. We see no reason to disturb that finding.

### III. Mistrial

Defendant, as its third point on appeal, argues that it was error for the trial Justice to deny its motion for mistrial when it became apparent that a juror was acquainted with several of the witnesses and had allegedly told a deputy that he would have trouble reaching an impartial verdict. Defendant further contends that the presiding Justice compounded the initial error by denying a motion for a new trial based on the earlier refusal to grant a mistrial.

The facts underlying defendant's various motions are as follows: at the commencement of proceedings on the second day of trial, the trial Justice informed counsel that it had come to his attention that a juror had notified a deputy that the juror's acquaintance with several witnesses might affect the impartiality of his judgment. Several possible alternatives to resolve the problem were discussed with counsel, including substituting an alternate juror or declaring a mistrial. Defense counsel noted that he would be willing to substitute an alternate. The trial Justice thereupon stated that he would interview the juror in chambers before making a decision. No objection was raised by either counsel to such a procedure. Once in chambers, the juror specifically denied that he had told a deputy that his acquaintance with several of the witnesses would affect his judgment. He went on to state that his judgment *would not* be jeopardized by such acquaintances.[6] Upon returning to the courtroom, the trial Justice again expressed an inclination to declare a mistrial. After brief argument by counsel,[7] however, the trial Justice evidently changed

---

6. The following colloquy took place in chambers:

    *Judge: It has come to my attention, Mr. [juror] that you have contacted a jury officer to advise him that you don't feel that you could properly continue to sit in the case. Is that right?*

    *Juror: I didn't say that.*

    *Judge: What did you tell him?*

    *Juror: There are some facts I would like you people to know, I don't think it would affect my decision on the jury.*

    . . . . .

    *Judge: Now you recollect that most of the witnesses are known by you?*

    *Juror: That is right.*

    *Judge: And this won't in any way effect your judgment?*

    *Juror: Not in the least.*

7. The main thrust of the argument was that the juror, at the initial voir dire, had admitted knowing plaintiff as they both worked at Scott Paper. Plaintiff's counsel pointed out that defense counsel had heard the witness list read before trial commenced and knew several witnesses were also from Scott Paper. Yet, no objections were raised at that time. The presiding Justice apparently was somewhat persuaded by that argument, because he noted that defense counsel was attempting to get "*two pieces of the apple.*" *See generally, State v. Chattley,* Me., 390 A.2d 472, 477 (1978) (waiver of objection to juror resulting from failure to raise issue at voir dire).

his mind and, without specifically denying defendant's subsequent motion for mistrial, told plaintiff's counsel to call his next witness.

It is well established in this jurisdiction that a motion for a mistrial is addressed to the sound discretion of the trial Justice. *See State v. Lindsey*, Me., 400 A.2d 368 (1979); *Cope v. Sevigny*, Me., 289 A.2d 682, 689–690 (1972). In *State v. Lindsey, supra,* we held that it was not an abuse of discretion for a trial Justice to deny a motion for a mistrial despite the revelation during trial that two of the jurors recognized one of the witnesses. The jurors, as was the case herein, denied that their judgments would be affected. Unlike the case now before us, the trial Justice in *Lindsey* did not conduct an *in camera* voir dire of the jurors to determine their impartiality, an omission we did not endorse.

Nor is this case unlike *State v. Kelley*, Me., 357 A.2d 890 (1976). Therein, two jurors viewed parts of a television program dealing with rape, the charge for which defendant was being tried. After assuring himself that the two jurors were still able to maintain an impartial attitude, the presiding Justice denied a motion for mistrial.[8]

In the case now before us, the trial Justice not only notified trial counsel of the prospective problem, but solicited their advice as how to remedy it. He further informed them that he would interview the juror in chambers, a suggestion raising no objection from counsel. Finally, after noting that defense counsel had known prior to trial, not only of the juror's acquaintance with plaintiff, but also that the witnesses in question worked at the same plant as both plaintiff and the juror, as well as satisfying himself of the juror's impartiality, the trial

Justice denied the motion for a mistrial. We can find no abuse of discretion in that decision. Inasmuch as there was no error in the denial of the mistrial motion, there can be no error in the denial of the motion for a new trial based thereon.

### IV. Expert Testimony

Defendant finally questions the propriety of the trial Justice's admission of expert testimony relating to the weather conditions in Waterville between January 1, 1973 and January 3, 1973.[9] The thrust of defendant's contention that the admission of such testimony constituted reversible error is two fold: first, defendant argues that the records upon which the witness relied were not present in court, thereby calling into question the validity of the witness' testimony. Second, defendant contends that it was denied an opportunity to inquire into the manner in which those records were kept.

We find neither argument capable of sustaining a charge of reversible error.

We are at somewhat of a loss to understand defendant's contention that the actual records were not present in court, given the following exchange between the trial Justice and the witness:

The Court: *Do you keep these records on separate sheets, or what?*

Witness: *Separate sheets.*

The Court: *Are these records with you now; do you have them with you?*

Witness: *Yes, they are.*

Although the witness went on to testify while relying on a book containing a compilation of the records, there is nothing in the transcript of the trial to discredit his earlier statement that the original records were present in court.

---

8. Defendant argues that *Kelley* lends support to its claim of prejudice rather than possessing facts analogous to the case now before us. Specifically, defendant argues that unlike the presiding Justice herein, the Justice in *Kelley* conducted an interrogation of the rest of the jury before determining the impartiality of that body. We agree that the record is silent as to any questioning beyond the juror in question. Defendant, however, had ample opportunity to request such an interrogation and failed to do

so. He cannot now be heard to argue that that omission is reversible error. *Cf. State v. Rowe,* Me., 397 A.2d 558 (1979).

9. The purpose underlying such testimony was apparently to show that the icy condition which gave rise to plaintiff's fall and existed for a time sufficient for defendant to have known about it and therefore to have corrected it. *See Isaacson v. Husson College, supra.*

Defendant's second point is more troublesome. Prior to the witness' taking the stand, defendant sought the court's permission to question him regarding the manner in which the records were kept. Without giving any basis for his decision, the trial Justice denied the request. Although the absence of any grounds for the denial of the motion necessarily hampers our review of its propriety, we are convinced that even if the order was erroneous, such error was harmless. Rule 901(b)(7), M.R.Evid., sets forth the requirements for the authentication of public records. That those requirements were met in this case becomes evident from the Court's interrogation of the witness arising from defendant's objection regarding the record's alleged absence in court.[10]

Finally, defendant raises several arguments relating to the admissibility of the testimony itself. We find it unnecessary to reach the merits of these contentions due to the absence of any timely objections in the Superior Court. *See Mandarelli v. McGovern*, Me., 393 A.2d 533 (1978); *McInnis v. Town of Bar Harbor*, Me., 387 A.2d 739 (1978).

In light of the conclusions reflected in our discussion above, the entry must be:

Appeal denied.

Judgment affirmed.

McKUSICK, C. J., and WERNICK, J., did not sit.

---

**10.** Rule 901(b), M.R.Evid., reads:

*By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:*

*(7) Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement or data compilation, in any form, is from the public office where the items of this nature are kept.*

The trial Justice specifically questioned the witness on the manner in which the records reflecting the weather conditions were kept. In response, the witness answered that the records were kept by him as one of his duties in the Department of Transportation, and had been so kept for twenty-three years, twenty-one of them by him personally.

For a discussion of Rule 901(b)(7), F.R.Evid., which for our purposes is identical to Rule 901(b)(7), M.R.Evid. *see* 5 *Weinstein's Evidence*, ¶ 901(b)(7)[01] (1978).