**Robert PLATTS and Mary Platts, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 86–0037 P.**

United States District Court, D. Maine.

April 28, 1987.

Maurice A. Libner, McTeague Higbee Libner Reitman McAdam & Case, Brunswick, Me., for plaintiffs.

David R. Collins, Paual D. Silsby, Asst. U.S. Attys. Portland, Me., for defendant.

GENE CARTER, District Judge.

## MEMORANDUM OF DECISION AND ORDER

In this action arising under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1982), Plaintiffs Robert and Mary Platts seek damages for an injury to Mr. Platts's back allegedly caused on August 17, 1984 by the negligence of Defendant United States Postal Service in its maintenance of an overhead garage door located in the Post Office building in Bath, Maine. The Court had previously ordered bifurcation of the trial and thus has before it only the question of liability.

## I.  FINDINGS OF FACT

In 1984, Mr. Platts was employed as a part-time truck driver for Shorey Trucking of Newport, Maine. He had been driving trucks part time for approximately sixteen years. In addition, until his recent retirement, he had been employed full time as a firefighter with the City of South Portland. He had previously injured his back in the course of this employment.

Shorey Trucking is one of several trucking companies that have contracted with the Postal Service to transport mail between various post offices in Maine. It trains its drivers by pairing a new driver with an experienced driver for a period of time, and had trained Mr. Platts in this manner. Mr. Platts received this training before the present Bath Post Office was built in 1976; he could not recall receiving any additional training regarding the new building.

One side of the present Bath Post Office is designed to accommodate the various trucks that pick up and deliver mail. This side of the building has seven delivery bays, each of which has an overhead garage door. These doors open into a large, undivided work area. Facing the exterior of the building, the doors are numbered one through seven from left to right. One key opens all seven doors and an employee entrance. If a driver enters the building through the employee entrance, he or she can open any garage door from the inside without a key.[1] In front of each door is a cement platform, the exterior face of which is protected by a rubber bumper. These platforms vary in height. The platforms in front of doors six and seven are the same height; this height corresponds to the height of the beds of the various contractors' trucks. Platform seven is rarely used, however, because the Postal Service stores a large number of metal mail cages there. Platform five is two to seven inches lower than platform six. The height of the platforms continues to decrease as the door numbers decrease.

In addition to the variation in platform height, only platform six is equipped with a Kelley plate, which is an adjustable metal ramp that bridges the gap between the truck bed and the platform. Use of the Kelley plate or a similar device called a skid plate is a safety requirement for unloading mail from the trucks. One, and possibly two, portable skid plates were available inside the Bath Post Office in 1984 which would enable contract drivers to use bays other than bay six. Nevertheless, platform six is the platform most frequently used by contract truck drivers at the Bath Post Office.

On the night in question, August 17, 1984, Mr. Platts had driven a route that he customarily drove several times a week: Portland to Augusta to Gardner to Bath and return to Portland. When he arrived at the Bath Post Office around four o'clock in the morning, his task was merely to unload one hamper[2] which was approximately one-quarter filled with mail. Although he would perform this task unassisted—the first Postal Service employee was not scheduled to arrive for another forty-five minutes—he was not alone at the Bath Post Office. Another contract truck driver was parked in bay five that morning. Mr. Platts testified that he always used platform six to unload mail, although he had used other platforms to pick up mail, because he believed that his key fit only door six and because door six was equipped with a Kelley plate. Although he had used skid plates at other Postal Service locations, he testified that he was unaware that one was available in Bath.

Having backed his truck up to platform six, Mr. Platts stepped up onto the platform, unlocked the door, knelt on his right knee with the right side of his body against the door, and grasped the overhead door handle with his right hand. He raised the door approximately one foot, at which point the door became difficult to raise. While remaining on his right knee, he twisted his torso so that he was almost facing the door, grasped the handle with both hands, and lifted the door slowly but smoothly as he stood up. It was during this latter movement that he felt a sharp pain in his lower back. He then unlocked the truck, opened its overhead door, and unloaded the hamper of mail by bouncing it from the truck to the platform. He did not use the Kelley plate. He then attempted to close the door, which continued to be difficult to move. The door stopped about six inches from the platform, and Mr. Platts had to force it down further so he could lock it.

Mr. Platts returned to the Portland Post Office but never mentioned his injury or the malfunctioning door to anyone there.

---

**1.** The present procedure at the Bath Post Office requires all truck drivers to enter the building through the employee entrance and to open the garage doors from the inside of the building.

**2.** Mail is handled in several different types of containers. A hamper is a 3–foot-by–4–foot metal container with canvas sides. It is mounted on six wheels and weighs between 50 and 60 pounds. A cage is constructed with an all-metal frame. It weighs between 230 and 240 pounds. Cages are more dangerous to unload than hampers because of their greater weight.

He did, however, mention it to his employer, Mr. Shorey, when Mr. Shorey called him the next morning to inquire whether he could work a route to Belfast that day. Despite his injury, Mr. Platts drove the Belfast route that next day. It was, however, the last day that he has worked.

## II. DISCUSSION

■ The Federal Tort Claims Act provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674 (1982). In order to establish the Government's liability in tort under this section, Plaintiffs must show that *under state law,* a private individual would be liable in like circumstances for similar conduct. *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). Neither party disputes that Maine law governs the determination of the Postal Service's liability in this case or that the pertinent provisions of Maine law are to be found in *Isaacson v. Husson College,* 297 A.2d 98 (Me.1972), and its progeny.

In *Isaacson,* the Maine Law Court specifically adopted the principles of sections 343 and 343A(1) of the *Restatement (Second) of Torts. Id.* at 104–05. These sections provide:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an

unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

*Restatement (Second) of Torts* § 343 (1965).

(1) A possessor of land is not liable to his invitees for physical harm caused . to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*

*Id.* § 343A(1) (emphasis added). *See also Williams v. Boise Cascade Corp.,* 507 A.2d 576, 577 (Me.1986); *Baker v. Mid Maine Med. Ctr.,* 499 A.2d 464, 467 & n. 3 (Me. 1985); *Murray v. Eastern Maine Med. Ctr.,* 447 A.2d 465, 466 (Me.1982).

■ It is undisputed that Mr. Platts was not an employee of the Postal Service but was lawfully present[3] at the Bath Post Office at the time of his injury on August 17, 1984. It is also clear that door six was not functioning properly when Mr. Platts used it on that date. It operated improperly for two distinct reasons. First, door six had a misaligned cable, which was repaired in early September. Second, it required a new spring, which was installed in late October.[4] Although no witness explained the operational effect of either of these problems, the Court infers from the testimony that each defect had a different effect on the operation of the door although neither rendered the door totally inoperable. The misaligned cable caused the door to jam as it was being operated. The worn

3. The Maine Law Court has abolished the distinction between invitees and licensees for purposes of premises liability. *See Poulin v. Colby College,* 402 A.2d 846 (Me.1979). The distinctions between trespassers and those lawfully present and between invitees and employees continue to be viable under Maine law. *See id.* at 851 n. 5; *Brubach v. Almy,* 520 A.2d 334, 337–38 (Me.1987).

4. The Court reaches the above conclusions by an analysis of the repair records kept by Demers Plate Glass. An invoice dated February 10, 1981 reveals that door six was equipped with a

left-hand-wound spring that was thirty-three inches long. Mr. LaFreniere of Demers testified that the doors at the Bath Post Office alternate with regard to the wind of their springs. In other words, if door six has a left-hand-wound spring, doors seven and five would have right-hand-wound springs, door four would have a left-hand-wound spring, etc. Only two repair invoices in the six-month period surrounding Mr. Platts's injury refer to a door having a left-hand-wound spring of the appropriate length. They are dated September 4, 1984 and October 28, 1984.

spring, however, caused door six to "work hard" as was evidenced by the testimony regarding its operation on September 9, several days after the cable was repaired. The Court finds that the injury suffered by Mr. Platts was caused primarily by the misaligned cable.

The evidence establishes that a malfunctioning overhead door is a danger that would pose an unreasonable risk of harm to those persons who need to open it in order to perform their duties. Furthermore, the testimony of Daniel Perry, Superintendent of Postal Operations at the Bath Post Office, establishes that the Postal Service was well aware of the risk of harm posed by malfunctioning doors. To counter this risk, it was the customary practice of the Bath Post Office to post a warning sign on the inside of such doors at eye level, usually around the glass, so that it would be seen from both inside and outside the door. In addition, the Bath Post Office maintained an ongoing relationship with a nearby business, Demers Plate Glass Company of Lewiston, to ensure that malfunctioning doors would be repaired promptly. It is less clear, however, whether Defendant knew or should have known that door six posed a risk of harm on August 17, 1984.

Plaintiffs have attempted to establish Defendant's actual knowledge of the risk from four separate sources. First, several employees of Shorey Trucking, three of whom had either worked with Mr. Platts at the South Portland Fire Department or knew him socially, testified that door six had functioned improperly for a considerable period of time. Two of these witnesses estimated that door six had been hard to open and close anywhere from two to four weeks prior to Mr. Platts's injury. Although both reported the difficulty to Mr. Shorey, neither reported it to the Post Office. Second, Mr. Shorey testified that although he was certain that he reported the problem to Mr. Chessey, Logistics Coordinator at the Portland Post Office, sometime after Mr. Platts had been injured, he had no specific present recollection of contacting the Portland Post Office prior to that time although he believed he had done so.

■ On the other hand, Mr. Chessey testified that he could recall only one conversation with Mr. Shorey about a malfunctioning door at the Bath Post Office. Although he could not accurately pinpoint this conversation in time, he did recall contacting the Bath Post Office and having been satisfied by this conversation that the problem was being addressed. Finally, invoices from Demers Plate Glass reveal that the Bath Post Office requested repairs to door six on or just before September 4, 1984.[5]

■ From this evidence, the Court concludes that the Bath Post Office had no actual knowledge of the problem with door six until sometime after Mr. Platts was injured. Consequently, the Court turns to a consideration of the determinative issue in this case:[6] whether the Postal Service should have known of the problem with door six on August 17, 1984. The Court begins its analysis by noting that Plaintiffs may rely on circumstantial evidence to establish this point. Isaacson, 297 A.2d at 105. One way in which Mr. Platts may

---

5. The Court takes judicial notice of the fact that September 4, 1984 was a Tuesday, the day following Labor Day. According to Mr. LaFreniere's testimony, an invoice would be dated September 4 if the call came in on that day or if the call had come in at the end of the prior business day. Thus, the repair call may have been received as early as Friday, August 31.

6. If the Court were to reach the other elements of this negligence action, it would find that both the misaligned cable and the worn spring presented a hazard which would have been obvious to any worker who attempted to open the door. Only the misaligned cable, however, would have been obvious to someone who did not attempt to open door six and then only upon inspection of the door. Despite the obvious nature of this hazard, the overwhelming weight of the testimony reveals that the contract truck drivers continued to use door six because the advantages of using a broken door equipped with a Kelley ramp outweighed the apparent risk. Consequently, if the Postal Service had had an opportunity to discover this defect prior to August 17, it would have had a duty to warn all workers of its existence or to take other precautions. Isaacson, 297 A.2d at 105.

carry this burden of proof is to "establish that the condition of which he complains and which exposed him to an unreasonable risk of harm was present for a time of sufficient duration *prior to the accident* to enable the reasonably prudent person to discover and remedy it." *Id.* (emphasis added). Plaintiffs have attempted to make this showing by presenting detailed information regarding the condition of door six following the accident. The Court is unpersuaded, however, that this evidence is sufficient to allow the Court to infer that the same condition also existed for a sufficient period of time prior to the accident so as to allow the Postal Service to discover and remedy it.

For instance, one Shorey driver, Mr. Brackett, testified with great specificity regarding the problem he encountered with door six on August 18, the night following Mr. Platts's injury. This description was similar to Mr. Platts's testimony; the Court finds it very credible. Mr. Brackett even inspected the door and discovered that the left cable was off the pulley. Most significantly, however, he could not recall any problem with door six prior to that date. Although he reported the problem both to Shorey Trucking and to the Portland Post Office, two weeks elapsed before the problem was partially corrected. In addition, he could recall no warning signs at any time on door six.

Plaintiffs apparently ask the Court to find that Mr. Brackett's testimony establishes that the Postal Service was not exercising ordinary care in relation to its duty to maintain door six between the time of his complaint and the actual repair of the door. From this evidence, the Plaintiffs would have the Court infer that this lack of care also antedated Mr. Platts's injury. The Court finds, however, that it may not reasonably draw this inference. Any finding that the two time periods were similar would depend upon a necessary predicate finding that the Post Office had actual knowledge of the problem with door six prior to the injury but failed to take the necessary corrective action. The evidence does not support this predicate.

Alternatively, Plaintiffs seek to establish that the problem with door six antedated Mr. Platts's injury by two to four weeks. The Court, however, gives little weight to the testimony regarding the malfunctioning of door six prior to Mr. Platts's injury. This evidence is the most indefinite and the least credible evidence received by the Court. It also is inconsistent with the documentary record. These witnesses all testified that the door was repaired by the end of September. The documents reveal, however, that door six continued to have problems until the end of October. Consequently, the Court discounts this testimony.

Even if the Court were to focus on the misaligned cable as a problem that would have been obvious upon inspection to those who did not operate the door, the Court cannot find that this problem existed for a period of time sufficient to allow the Postal Service to discover it. The only testimony that identifies this problem was that offered by Mr. Platts concerning August 17 and by Mr. Brackett concerning August 18. Without more, the Court cannot bootstrap this evidence to establish that the cable was misaligned for any significant period of time prior to August 17.

■ Recognizing perhaps this weakness in their case, Plaintiffs have invoked the doctrine of *res ipsa loquitur*, citing *Hull v. L. & A. Montagnard Social Club, Inc.*, 498 A.2d 597 (Me.1985). The Court rejects this argument. It appears to the Court that the problem with door six may well have been caused by another contract truck driver just before Mr. Platts encountered it on August 17, giving Defendant no opportunity to discover and remedy it. Thus, application of the doctrine under the circumstances of this case would allow the Court to infer Defendant's negligence without removing the conduct of other actors as the cause of Mr. Platts's injury. Nothing in Maine law or in the *Restatement (Second) of Torts*, upon which Maine law relies, supports such a result. *See Ginn v. Penobscot Co.*, 334 A.2d 874, 879–80, *modified on other grounds*, 342 A.2d 270 (Me.1975).

Because the Court finds that the evidence fails to establish that door six had been in a defective condition for a time of sufficient duration prior to August 17, 1984 to enable Defendant to discover and remedy it, the Court concludes that Plaintiffs have failed to carry their burden of persuasion on this aspect of their negligence action. Consequently, the Court does not reach the issue of the comparative negligence, if any, of Plaintiff Robert Platts.

For the reasons set forth fully above, the Court concludes that judgment should enter for Defendant United States of America, and it is hereby

So ORDERED.