**Leslie EVERETT, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 88-0160 P.

United States District Court, D. Maine.

June 30, 1989.

just a little over a year ago. As such, the program has no real track record.

Kenneth W. Hovermale, Portland, Me., for plaintiff.

David R. Collins, Asst. U.S. Atty., Portland, Me., for defendant.

## OPINION AND ORDER

GENE CARTER, District Judge.

## I. INTRODUCTION

This case arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680. Jurisdiction is based on 28 U.S.C. § 1346(b). Plaintiff Leslie Everett seeks recovery for personal injuries allegedly sustained when he fell in the truck receiving area of the United States Postal Service building in Portland Maine, causing damage to his back and hip.

The case was tried before the Court, sitting without a jury. Evidence was submitted on issues of both damages and liability.

## II. FINDINGS OF FACT

### A. *The Portland Post Office*

The United States Postal Service office in Portland, Maine serves as one of several distribution points for mail around the state. The post office building and grounds include a sizable area used solely for shipping and receiving mail. In this shipping and receiving area are a number of loading docks, to which mail-carrying trailers are backed up for loading and unloading. Also contained within this area is an open, paved yard where the trailers may be maneuvered for access to and egress from the loading docks. The trailers may be parked temporarily in the yard if all the loading docks are full. The yard and loading dock areas are well lit at night by high-pressure sodium lamps.

In 1987, the year in which Plaintiff's injury allegedly occurred, the Postal Service had a snow plowing and removal contract with RAS Enterprises. Under the contract, RAS would plow the shipping area and yard within several hours after a major snowstorm, defined as greater than two to three inches of snow accumulation. Postal Service workers or the truck drivers would assist with this effort by moving the trailers out of the loading dock area. After plowing, the trailers would be returned to the loading docks. Occasionally, Postal Service workers would do additional plowing with Postal Service vehicles, including "back-dragging" empty loading bays.[1]

Sanding and salting was not part of the plowing agreement and would be done by RAS only upon specific request. Instead, the Postal Service typically did its own sanding and salting, and kept a sand truck with a spreader on the premises for this purpose. The spreader is capable of flinging sand and salt in a rough circle approximately thirty feet or so in radius. After the trailers had been moved and RAS had plowed, the Postal Service's own trained and experienced personnel would plow or salt as needed using the truck and spreader. If the trailers had not been moved and were still at the bays, the sand truck could be backed into empty bays, between trailers, and sand applied by the spreader. The spreader truck would also drive closely along the front edge of the trailers parked at the various loading bays, and sand would reach well underneath the trailers. Alternatively, workers could stand in the bed of the sand truck and spread sand using a shovel. This method was used only if the sand spreader was unavailable due to repairs. In addition, three wheeled sand gurneys, containing sand, a shovel and a scoop, were kept near three of the loading bays and were available to Postal Service workers and truck drivers for use as needed.

The Postal Service in Portland had a full-time maintenance crew that supervised the RAS contract and performed whatever supplemental sanding, salting and snow removal was required. Ervin Morin was the Manager of Plant and Equipment Engineering ("maintenance"), and Ralph Corbin and John Mullen were his two immediate subordinates on the other "tours," or shifts, who assumed various delegated maintenance duties and authority, which included the sanding and salting of the loading area and yard as needed. Arthur Pitou and Tammy Spera were the platform supervisors, who are in charge of docking area and lot conditions. It was their duty to walk around the yard area twice during each tour to assess conditions in the yard.

### B. *Plaintiff's Job*

The United States Postal Service contracted with Dart Transportation of South Portland, Maine, a private hauling contractor, for the trucking of mail from one postal center to another. Plaintiff Leslie Everett had been employed by Dart Transportation as a truck driver hauling mail for the Postal Service since approximately 1977.

From 1981 until his injury allegedly occurred in 1987, Plaintiff drove the same hauling route for Dart Transportation. Plaintiff's route, known as the "Bangor run," involved arriving at the Portland post office building at 11:00 a.m. in his tractor and picking up an assigned trailer from the yard or loading dock.[2] Plaintiff then drove north to Bangor, where he would drop the trailer and pick up another. From there, Plaintiff's next stop was Waterville, where some mail might be removed from the trailer and more might be added. Augusta was the next stop, where some more mail might be removed and the trailer typically would then be fully loaded for the trip to Port-

---

**1.** "Back-dragging" is a method of clearing snow from a narrow area. The plow driver raises the plow and drives forward into the narrow area, drops the plow, and backs out of the space dragging snow with the plow's back side.

**2.** The drivers did not have any one specific trailer assigned to them. The Postal Service used as many as four hundred trailers, and on any given trip, a driver would have no way of knowing which particular trailer he would be pulling. There was no indication on the evidence that Plaintiff, or any of the other drivers, placed any particular significance on the assignment of trailers on any given day.

land. Plaintiff would return to Portland, hauling the trailer he picked up in Bangor now filled with mail accumulated along the way, arriving at the post office at approximately 7:20 to 7:30 p.m.

When Plaintiff arrived at the Portland post office, he would pull into the yard area. Usually, Plaintiff was assigned loading dock bay 37. If bay 37 was free, Plaintiff would stop, blow his air horn and get out of the tractor. He would remove the padlock and safety chain from the trailer door, return to the tractor, and back the trailer into the loading dock. If bay 37 was not available, Plaintiff would receive instructions from the loading dock supervisor to either use another bay or drop the trailer in the yard. After dropping the trailer, Plaintiff would return to Dart Transportation, where he would leave his trailer and go home.

In order to drop a trailer at the bay, Plaintiff followed a certain procedure. He would first shut off the air to the brakes, which locks the brakes and secures the trailer from rolling. Plaintiff would then get out of the tractor cab and swing to the back of the tractor, between the cab and the trailer, without alighting from the vehicle. He would unhook the air for the brakes and the cord for the trailer light signals, and hang both on the back of the tractor. Plaintiff would then swing down from the tractor onto the ground on the driver's side. Next, Plaintiff would release what is known as the "fifth wheel." The fifth wheel is the steel skid plate on the back of the tractor, on which the nose of the trailer rests, secured by locking jaws. In order to release the fifth wheel, Plaintiff had to pull a handle located under the nose of the trailer.

From there, Plaintiff would walk around the front of the tractor to the passenger side of the vehicle where the landing leg crank is located. The landing legs are the metal supports for the trailer that hold it up when there is no tractor attached to support it. These landing legs crank up into the trailer when not in use, and crank down to provide support when the trailer is to be dropped. Plaintiff had to crank the legs down in order to pull his tractor away from the trailer. The leg crank, which operates manually, is located approximately eleven feet to the rear of the trailer's front end. Once the landing legs were in place and supporting the trailer, Plaintiff could pull his tractor away.

Dart Transportation owns the tractors used on its post office runs but not the trailers. The trailers are provided to the United States Postal Service under a leasing agreement with a company called Trans America Trailer Leasing, located in Springfield, Massachusetts. Trans America provided and maintained the trailers for the postal service. Plaintiff's instructions, in the event of a serious problem with one of the trailers, was to either call or have someone from the postal service call Trans America. Trans America was responsible for arranging for repair work to be done locally.

## C. *The Accident*

On January 10 and 11, 1987, a six- to twelve-inch snow fall blanketed the Portland area. After the storm, RAS, in accordance with its contract, plowed the shipping and receiving area. There was no more significant weather from January 11 through the time the accident allegedly occurred.

On January 12, 1987, Plaintiff worked his normal shift. He picked up a trailer in Portland, drove to Bangor, and dropped the trailer there. He picked up another trailer, drove to Waterville, Augusta, and back to Portland, where he dropped the trailer at the end of his trip. Because his bay was not available, Plaintiff dropped the trailer in the yard upon checking with the platform supervisor. Plaintiff testified that he recalled the surface conditions in the yard that day as "snowy."

The temperature was around the freezing point on January 13, 1987, when Plaintiff arrived at the post office yard in Portland and picked up a trailer for the Bangor run. In Bangor, Plaintiff dropped this trailer, and, as usual, picked up another trailer for the return trip. His return to Portland, with stops at Waterville and Au-

gusta, was without incident. Plaintiff does not recall the driving conditions that day.

When Plaintiff returned to the Portland post office at the end of his run, he found that the surface condition of the yard and loading dock area was "plowed, packed snow." Plaintiff pulled into the yard, blew his horn, and removed the padlock and safety chain. The door for bay 37 opened, and Plaintiff backed the trailer into the bay. Plaintiff then locked the brakes, unhooked the air hose and signals, stepped down to the ground on the driver's side, and pulled the handle releasing the fifth wheel. Plaintiff then walked around the front of the tractor to the passenger side, in order to crank down the trailer's legs.

Plaintiff's account of his alleged fall is as follows. He pulled the crank handle from its storage position beneath the trailer and locked it into position in the crank. Plaintiff began to crank down the legs, but encountered difficulty. Plaintiff attempted to place the gear box mechanism into low gear to make the cranking effort easier, but was unable to do so. Plaintiff proceeded to apply brute force to the handle in an unsuccessful attempt to force the gears.

Plaintiff decided to try to loosen the gears by hitting them with a two-pound hammer he kept in the tractor cab for this purpose. He walked back to the driver's side by going beneath the nose of the trailer, retrieved the hammer, and retraced his steps to the crank. Plaintiff was unable to loosen the gears with the impact from the hammer, and was also unable to place the crank in low gear. Plaintiff then decided to apply all his strength to the crank, hoping to force the legs down. He testified that, even when the gears are not frozen, it takes "incredible strength" to lower the landing legs while the mechanism is in high gear. He was successful in getting the

legs down to within four inches of the ground. At that point, however, Plaintiff's own legs went out from under him, and he fell to the ground.

Plaintiff testified that he laid on the ground for around ten minutes, after which he was able to pull himself up into the tractor cab. He slowly eased the tractor out from under the trailer, which he was able to do because of his success in getting the legs to within four inches of the ground. Plaintiff drove to the Dart Transportation lot in South Portland, where he left his tractor. From there, Plaintiff called his supervisor at Dart Transportation to let him know that he had fallen and was not likely to be available for work the following day. Plaintiff then went home, and began receiving medical treatment the next day. He never returned to work as a truck driver.

### III. LIABILITY

The Federal Tort Claims Act provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674 (1982). In order to establish the government's liability in tort under this section, Plaintiff must show that a private individual would be liable under state law for similar conduct under similar circumstances. *Platts v. United States,* 658 F.Supp. 850 (D.Me.1987), *citing United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

#### A. *Negligence of Defendant*

Under Maine law, a possessor of land owes a duty to use reasonable care to provide a safe premises for all persons lawfully thereon. *Erickson v. Brennan,* 513 A.2d 288, 289 (Me.1986).[3] An invitee[4] may

3. A possessor of land is defined as a person who is in occupation of land with the intent to control it. *Erickson v. Brennan,* 513 A.2d 288, *citing* Restatement (Second) of Torts § 325E (1965).

4. Maine has done away with the common law distinctions between business invitees and licensees, in favor of a common law duty of reasonable care owed to all who are lawfully on the

premises. Thus, all invitees—those present on the land through an owner's express or implied invitation, whether or not for a purpose connected with the owner's business, as well as those visiting for purely social purposes—are owed a duty of reasonable care in providing a safe premises for their use. *Cashman v. United States,* Docket No. 87-0065 P, 1989 WL 42626

recover damages from a possessor of land for injuries sustained as a result of failure to maintain a reasonably safe premises. *Orr v. First National Stores, Inc.*, 280 A.2d 785, 791 (Me.1971). It may not be disputed that Plaintiff was an invitee, lawfully on the premises and therefore owed a duty of care. Plaintiff's employer had a contractual duty to provide a driver and tractor to pick up and deliver mail-carrying trailers from the Portland post office. On the day the injury allegedly occurred, Plaintiff was on his normal, routine schedule, dropping off a trailer at the completion of the Bangor run. These facts clearly describe an invitee who is on the premises lawfully, and Plaintiff was therefore owed the same duty of reasonable care owed to invitees generally. *See Cashman v. United States*, Docket No. 87–0065 P (D.Me. March 29, 1989).

In *Isaacson v. Husson College*, the Maine Law Court has established the analysis that controls owner or controller liability for invitee safety. 297 A.2d 98 (Me.1972). *Isaacson* adopts the analysis in sections 343 and 343A(1) of the *Restatement (Second) of Torts* (1965), which provides:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

*Restatement (Second) of Torts* § 343. (1965).

(1) a possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should an-

ticipate the harm despite such knowledge or obviousness.

*Id.* § 343A(1). Under the Law Court's analysis, while not an insurer of safety, an owner or occupier is "under legal obligation to use ordinary care to ensure that the premises are reasonably safe for invitees in the light of the totality of the existing circumstances." *Isaacson v. Husson College*, 297 A.2d at 103. Plaintiff bears the burden of establishing that "the condition of which he complains and which exposed him to an unreasonable risk of harm was present for a time of sufficient duration prior to the accident to enable the reasonably prudent person to discover and remedy it." *Id.* at 105.

Plaintiff's claim for relief here is based on one simple premise: that the alleged failure of Defendant to sand, salt or otherwise rid the loading dock area of bay 37 of slippery snow proximately caused Plaintiff to fall and sustain the alleged injury for which he now seeks damages. The Court concludes that Plaintiff has not met the burden of proof imposed upon him in the *Isaacson* analysis.

■ According to the Restatement, Plaintiff must show, *inter alia*, that Defendant knew, or by the exercise of reasonable care should have known, that a dangerous condition existed and that it posed an unreasonable risk of harm to invitees. *Restatement (Second) of Torts* § 343(a). As discussed above, Plaintiff bears this burden of proof. *Isaacson*, 297 A.2d at 105. This element presumes that a dangerous condition has been proven to exist. The Court, however, is not convinced that Plaintiff has sufficiently proven this threshold matter.

In his claim for relief, Plaintiff is not arguing that the presence of packed snow, by itself, poses an unreasonably unsafe condition. Rather, the condition of which Plaintiff complains is that Defendant allegedly left the packed snow untreated with sand or salt for traction. The threshold factual issue on which Plaintiff bears the burden of proof, then, is whether the area around the crank for the trailer legs was left unsalted and unsanded.

(D.Me. March 29, 1989), *citing Poulin v. Colby*     *College*, 402 A.2d 846, 848 (Me.1979).

The sole direct support, either testimonial or evidentiary, for Plaintiff's claim that the area was left unsalted and unsanded is Plaintiff's own testimony. When asked whether he recalled if the yard had been sanded before he left for Bangor on the morning of January 13, Plaintiff testified that he did not remember. Plaintiff testified that he recalled the yard's surface condition when he returned to Portland at the end of the day as "plowed, packed snow." No other evidence either directly supports or contradicts Plaintiff's report of the surface conditions on the evening of January 13th.

There is, however, considerable circumstantial evidence that is contrary to Plaintiff's claim. Mr. Mullen, a platform supervisor in January 1987, testified that it was the maintenance department's procedure to sand and salt the area after a snow storm of over two to three inches. This sanding and/or salting procedure would include backing the sand truck into loading bays between the trailers, and the spreader would throw sand well underneath the adjacent trailers. The procedure would also include driving the sand truck along the fronts of the trailers, allowing the spreader to throw sand underneath the trailers. There was testimony that this procedure throws most of the sand in the area of the landing gear and the fifth wheels of the trailers. In addition, no difficulties were reported by other drivers who also used loading bay 37 on January 13th before Plaintiff arrived back in Portland at the end of the trip. On the other hand, a driver for Dart Transportation at the time the accident allegedly occurred, Rodney Appleby, testified by a deposition admitted in evidence that the surface condition in the Portland post office yard was often quite slippery during the winter, and implied that plowing and sanding there was sporadic.

Thus, the Court is presented with only Plaintiff's testimony specifically addressing the surface conditions on the day in question, as well as conflicting circumstantial evidence addressing the level of winter maintenance at the site generally. Critically absent is direct testimony or other evidence to corroborate Plaintiff's claim that

the area under and around the trailer legs and fifth wheel pin was unsanded and unsalted. No one saw Plaintiff fall. No one came to Plaintiff's aid. Plaintiff did not report an accident to anyone at the post office who could have seen the condition of the surface at the time Plaintiff allegedly fell. The Court recognizes that direct evidence is not essential to the proof that an unreasonably dangerous condition existed. *See Isaacson*, 297 A.2d at 105. The fact of notice of the unreasonably unsafe condition, and the lapse of a reasonable opportunity to correct it may be proved by circumstantial evidence. *Id.* The Court finds, however, that on this evidence, Plaintiff has failed to meet his burden of proving that a dangerous condition, namely slippery, plowed, packed snow, without benefit of sand or salt for traction purposes, existed on January 13, 1987.

■ For purposes of analysis in accord with the Restatement, this finding obviates the need to consider whether Defendant knew or reasonably should have known that a dangerous condition existed. In the interest of rendering a comprehensive decision on liability for purposes of appellate review, the Court will complete the *Isaacson* analysis. Assuming, *arguendo*, that Plaintiff had met his burden of proving that an unsanded, unsalted, slippery snow surface existed and thus presented an unreasonably unsafe condition on January 13, 1987, the Court would have continued in its analysis of premises liability pursuant to the Restatement position adopted in *Isaacson*. Following this assumption and applying the three-pronged Restatement analysis, the Court's conclusion would be that Defendant had breached a duty to invitees.

First, the evidence clearly shows that Defendant should have discovered any dangerous condition that existed. The building supervisor testified that it was his duty to walk around the parking lot to see if it needed to be sanded. It was also established that one of the platform supervisors' duties was to inspect the yard and loading areas at least twice during each shift. Thus, if there was a dangerous condition at bay 37, it would have been discovered

through this exercise of reasonable care. The mere fact that Defendant's workers undertook this frequent inspection and maintained a sanding and salting procedure indicates that they realized the existence of a risk to Plaintiff and other drivers.

It is equally clear that, assuming that the storm on January 10th and 11th had created a slippery condition in the yard and near the loading bays, Defendant had an adequate amount of time in which to sand or salt. The storm ended on January 11th, while the alleged accident did not occur until the evening of January 13th. This would be more than sufficient time to remedy the assumed dangerous condition. *Isaacson*, 297 A.2d at 105.

Second, the careful procedure of clearing snow and applying sand or salt, as described by Defendant's employees, indicates that the Postal Service was aware that the drivers may not discover or realize the danger, or may fail to protect themselves against it. It is true that Plaintiff may not rely blindly on the presumption that Defendant sanded and salted that day. *See Isaacson*, 297 A.2d at 103. However, Defendant could reasonably anticipate that the drivers, Plaintiff included, might fail to protect themselves from the dangers of a slippery surface. Reason to anticipate harm may arise "where the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk." Id. at 103, citing Restatement (Second) of Torts § 343A, comment f. There was ample evidence to suggest that Plaintiff, feeling the pressure at the end of a long day, might choose to work on the slippery surface despite his awareness of the possible danger.[5] Accordingly, Defendant should have

expected that Plaintiff might fail to protect himself from the known danger presented by the slippery surface.[6]

Finally, it follows from the assumption that the plowed, packed snow under the trailers had been left unsanded and unsalted that Defendant failed to exercise reasonable care. The Postal Service had a routine for sanding and salting the yard as needed. It has been established on the evidence that the yard, including the loading bay area, had been plowed. In order to plow along the loading bays, the trailers must have been pulled out. It would have been within the scope of the Postal Service's normal maintenance procedure described at trial to have sanded or salted the area while the trailers were pulled out. Alternatively, the sand spreader, driven along the front edge of the trailers, would have thrown sand far enough below the trailers to provide a sanded surface near the landing gear crank. Thus, from an assumption that a dangerous condition existed, it follows that the Defendant failed to exercise reasonable care.

### B. *Comparative Fault of Plaintiff*

■ Having assumed, *arguendo*, that a dangerous condition existed at bay 37 on January 13, 1987, and that Defendant is liable as the owner or possessor of the premises for this dangerous condition, the Court turns to an evaluation of Plaintiff's comparative fault for the injury he allegedly suffered. The Maine Law Court has said that a plaintiff "cannot rely blindly on the presumption of the discharge of one's duty, but must at all times exercise ordinary care for his own safety." *Isaacson v. Husson College*, 297 A.2d at 103. A plaintiff whose own negligence contributes to an accident may have his or her recovery reduced according to the level of responsibility for the injury. 14 M.R.S.A. § 156

---

5. This is not to suggest that Defendant should have anticipated Plaintiff's strenuous effort to release the broken gear mechanism that, by his own admission, ultimately contributed to the cause of his alleged injury.

6. The Court is careful to point out, however, that this finding does not eliminate the need to consider Plaintiff's comparative negligence. "In such cases [where Plaintiff proceeds despite

knowing of a possible danger] the fact that the danger is known, or is obvious, is important in determining whether the invitee is to be charged with contributory negligence or assumption of risk." *Isaacson*, 297 A.2d at 105, citing Restatement (Second) of Torts § 343A comment f. The Court therefore considers Plaintiff's comparative negligence *infra*.

(1965). In order to successfully assert comparative negligence, a defendant bears the burden of proving, by a preponderance of the evidence, that an injured plaintiff was causally negligent. *Poulin v. Colby College,* 402 A.2d 846, 851 (Me.1979).

Defendant has met this burden of proof here, showing that Plaintiff did not act in a reasonably prudent manner. Plaintiff testified that the landing gear crank took "incredible strength" to lower in high gear, even when the gears were not jammed. He testified that, on previous occasions when the gear had jammed, it had taken "all [his] physical strength" to lower the landing gear. Plaintiff also testified that he recognized that the yard surface was "potentially slippery" and that he walked "easier and alot more careful" than he would on dry ground. After releasing the air hose and turn signal connections and stepping off the tractor, Plaintiff walked around the front of the tractor, back under the trailer's nose to fetch the hammer, and returned to the crank by walking beneath the trailer. Cumulatively, this testimony indicates that Plaintiff was aware that forcing the landing gear crank would be a physically difficult, awkward task that he would have to perform on a surface offering limited traction. Armed with this knowledge, it was unreasonable for Plaintiff to proceed with his effort.

Plaintiff's failure to take measures to either ease the task or seek assistance magnifies the unreasonableness of his conduct. Plaintiff knew that there were as many as three sand gurneys available at the loading dock for drivers to use. On January 13th, however, Plaintiff chose not to use the available sand, even though he testified that on other occasions, he had used sand from one of the gurneys to improve traction for his tractor's wheels.

Nor did Plaintiff choose the available option of dropping the trailer out in the yard, where Plaintiff acknowledges sanding occurred regularly [7] and where he might have avoided attempting the very difficult task of forcing the crank while standing on a slippery surface.

Plaintiff testified that he knew that if he encountered any trouble with the trailer, he should report it to Trans America and the Postal Service personnel on duty and seek their assistance. Plaintiff's explanation for his failure to call Trans America was that this jammed landing gear crank was not sufficiently serious a problem to warrant a call for assistance. Yet Plaintiff also testified that on another occasion, when he was unable to lower the gear despite applying substantial force, he had sought, and received, assistance from post office personnel.[8]

Plaintiff also suggested that the response time would be quite slow if he called Trans America for assistance, explaining that "when we were out there, we were on a time schedule and anything we could do ourselves, we did, anything physically possible." Setting aside the discussion of whether lowering the landing gear was physically possible, the Court notes that the accident allegedly occurred at the end of Plaintiff's shift, when pressure to maintain a time schedule would presumably have abated. Any time pressure Plaintiff felt at the end of his shift may very likely have been self-imposed and not job-related, and thus not chargeable against Defendant.

Had Plaintiff exercised any of the options available to him, he would not have suffered the alleged injury for which he now seeks relief. The Court concludes that Defendant has met its burden of proving

---

**7.** Plaintiff was unable to recall whether or not the yard area was actually sanded on January 13, 1987.

**8.** In addition, Defendant has argued that Plaintiff had an additional option of using the "yard spotter" or "hustler" to remove the trailer from the tractor. The yard spotter is a small vehicle with a short wheel base, equipped with a hydraulic lift, that has a fifth wheel similar to that found on the back of a tractor, and is used to move trailers around the yard without a tractor. Plaintiff's undisputed testimony is that three yard spotters are needed to remove a trailer from a tractor. Two yard spotters are needed to lift the trailer, placing it on the third. The Portland post office, however, apparently has only one yard spotter. Accordingly, the Court rejects Defendant's argument that using the yard spotter presented a viable option for Plaintiff.

that Plaintiff acted unreasonably under the circumstances, and that his negligence was a proximate cause of any injury he may have suffered.

### C. *Apportionment of Liability*

 Having determined that Plaintiff was causally negligent, and assuming that Defendant was liable for a dangerous condition on the premises, the Court considers the apportionment of damages between the parties. The Maine comparative negligence statute mandates an apportionment of the damage between two persons, both of whom acted unreasonably and thus brought about the damage. *Wing v. Morse,* 300 A.2d 491, 499 (Me.1973).

Maine's comparative negligence statute provides, in pertinent part:

> Where a person suffers death or damage as a result partly of his own fault and partly of the fault of any other person or persons, a claim in respect of that death or damage shall not be defeated by reason of the fault of that person suffering the damage, but the damages recoverable in respect thereof shall be reduced to such extent as the jury thinks just and equitable having regard to the claimant's share in the responsibility for the damage ...

14 M.R.S.A. § 156. If the Court finds Plaintiff's negligence to be equal to or greater than Defendant's, Plaintiff may not recover under the statute. 14 M.R.S.A. § 156; *Diotima Shipping Corp. v. Chase, Leavitt & Co.,* 102 F.R.D. 532 (D.Me.1984). If it is determined that Plaintiff's negligence is less than that of Defendant, the damages recoverable by Plaintiff shall be reduced to the extent that the Court, as fact finder, finds to be just and equitable. 14 M.R.S.A. § 156; *Cashman v. United States,* Docket No. 87–0065 P (D.Me. March 29, 1989).

On the basis of the findings of fact, assumptions of Defendant's negligence, and analysis set out above, the Court finds that Plaintiff's negligence is greater than Defendant's. This is based, *inter alia,*

upon the fact-specific conduct of each of the parties, as well as a comparative weighing of the importance of proper performance of Defendant's duty of due care for the invitee's safety, the Plaintiff's duty of care for his own well-being, and the relative potential for injury likely to result from a breach of these respective duties. *Cashman v. United States,* Docket No. 87–0065 P. Because Plaintiff's negligence is greater than the assumed negligence of Defendant in leaving a dangerous condition on the premises, Plaintiff may not recover in this action. 14 M.R.S.A. § 156.[9]

### IV. ORDER

Accordingly, it is ORDERED that judgment be, and it is hereby, GRANTED in favor of Defendant.

---

**9.** Because the Court has found that Plaintiff may not recover, there is no reason to address Plaintiff's request for damages.