STATE OF MAINE                                    SUPERIOR COURT
                                                  CIVIL ACTION
YORK, ss.                                         DOCKET NO. CV-08-354
                                                  CTAP - YOR - 1514

NANCY DALZELL, Personal
Representative for the Estate
of ALLEN BENNISON,

            Plaintiff


      v.                                          ORDER


BROUSSEAU ENTERPRISES, INC.,
d/b/a AIRPORT VARIETY,

            Defendant


      Nancy Dalzell is the personal representative for the estate of her son, Allen

Bennison. Mr. Bennison died after being stabbed by Joshua Stewart behind the Airport

Variety convenience store in Sanford, Maine. Ms. Dalzell brought this action on the

estate's behalf against the owner of Airport Variety, Brousseau Enterprises, Inc.,

alleging that Mr. Bennison wrongfully died due to the company's negligence. The

defendant moves for summary judgment.    Following hearing, the motion will be

Granted.

## BACKGROUND

      Airport Variety is located in an industrial, non-residential area in Sanford,

Maine. (Supp. S.M.F. ¶ 7.) Prior to January 23, 2007, there was little criminal activity at

the store. (Supp. S.M.F. ¶ 8; Bates Depo. at 62.) Apart from minor thefts, there had been

an incident involving a bag of suspicious white powder in 2004, and a domestic assault

in 2004 or 2005. (Supp. S.M.F. ¶ 8; Opp. S.M.F. ¶ 8; Bates Depo. at 62–63.) Defendant

Brousseau Enterprises, Inc., purchased Airport Variety in January 2006. (Supp. S.M.F.

¶ 11.) Between January 2006 and January 23, 2007, the police were only called to Airport

Variety once. (Supp. S.M.F. ¶ 11.) That call was placed because a van had damaged a fence. (Supp. S.M.F. ¶ 11; Ibrahim Aff. ¶ 12.)

On January 23, 2007, Crystal D. Son and Jessica Prevatt were the employees on duty at Airport Variety. (Supp. S.M.F. ¶¶ 14–15.) Joshua Stewart, John Stewart, and James Curit entered the store some time before 8:00 p.m.[1] (Supp. S.M.F. ¶ 16; Pl.'s Add'l S.M.F. ¶ 25.) Ms. Son was acquainted with the Stewarts because they were her cousins by marriage. (Supp. S.M.F. ¶ 17.) She had also worked with Joshua Stewart at another gas station in 2004. (Supp. S.M.F. ¶ 19.) Ms. Son had reported Joshua to the police for a theft she witnessed him commit at that job. (Supp. S.M.F. ¶ 19.) Despite these connections, Ms. Son testified that she had not spoken with either of the Stewarts for a number of years. (Def.'s Opp. to Pl.'s Add'l S.M.F. ¶ 27; Son Depo. at 37.)

After breaking contact with the Stewarts, Ms. Son had heard rumors that the men were involved in drug dealing but did not know if the rumors were true, and she did not believe that the men were dealers. (Pl.'s Add'l S.M.F. ¶ 28; Son Depo. at 37.) Ms. Son did not observe that Joshua Stewart was carrying a weapon or that he was angry, and there is no indication that she had reason to believe he might be violent. (Supp. S.M.F. ¶¶ 24–25.) Ms. Son did not know James Curit. (Supp. S.M.F. ¶ 17.)

Jessica Prevatt, the other Airport Variety employee on duty that evening, had known James Curit when she was approximately eleven years old but had not socialized with him since. (Pl.'s Add'l S.M.F. ¶ 40; Def.'s Opp. to Pl.'s Add'l S.M.F. ¶ 40; Prevatt Depo. at 22–24.) She knew James Stewart because her friend had dated his brother approximately eight years earlier. (Pl.'s Add'l S.M.F. ¶ 41; Def.'s Opp. to Pl.'s

---

[1]    There is some dispute about whether a fourth man was also present. (*Compare* Supp. S.M.F. ¶ 16 *with* Supp. S.M.F. ¶ 17 *and* Pl.'s Add'l S.M.F. ¶ 26.) If this individual was present, he allegedly left before any of the actions giving rise to this litigation occurred and he is therefore immaterial to this motion.

2

Add'l S.M.F. ¶ 41; Prevatt Depo. at 33–34.) Ms. Prevatt did not know Joshua Stewart. (Supp. S.M.F. ¶ 36.)

When the three men came into the store, Ms. Prevatt was in the process of taking trash out to the store's dumpster. (Supp. S.M.F. ¶ 35.) The store did not have a back door so Ms. Prevatt had to walk the trash from behind the counter, out the front door, and around to the dumpster behind the building. (Pl.'s Add'l S.M.F. ¶ 43.) She made about three trips that evening. (Supp. S.M.F. ¶ 38.) As Ms. Prevatt was emptying the trash, the man that Ms. Son did not know (presumably Mr. Curit) attempted to purchase alcohol. (*See* Supp. S.M.F. ¶ 18.) Ms. Son perceived that the man was intoxicated and refused to sell him the alcohol. (Supp. S.M.F. ¶ 18.) Joshua Stewart was seen looking at the store's shelves, and he asked Ms. Son where the store's cameras were located. (Pl.'s Add'l S.M.F. ¶¶ 29, 31.) She responded that they were everywhere. (Pl.'s Add'l S.M.F. ¶ 31.) John Stewart then stated that she was only referring to the cameras inside the store.[2] (Pl.'s Add'l S.M.F. ¶ 33.) Joshua Stewart then stated that he had "business to take care of."[3] (Pl.'s Add'l S.M.F. ¶ 34.) Based on the men's behavior, Ms. Son believed that they intended to steal from the store and asked them all to leave. (Supp. S.M.F. ¶¶ 20–21; Pl.'s Add'l S.M.F. ¶ 29; Son Depo at 38–39.) They left the store without incident. (Supp. S.M.F. ¶ 21.)

---

[2] The source for this is Detective Armand L. Lucier's summary of an interview he conducted with Ms. Son shortly after the incident. It is not sworn, authenticated, or admitted to by the defendants, and it does not concern matters within the scope of Ms. Son's employment, making it generally inadmissible hearsay. It would be admissible to show the effect on Ms. Son's state of mind and whether she should have foreseen the stabbing. In any event, the court notes that Ms. Son's statements during that interview are entirely consistent with her subsequent deposition testimony, despite the plaintiff's suggestions to the contrary.

[3] This hearsay statement is admitted by the defendants, and is admissible to show foreseeability and effect on Ms. Son. In Detective Lucier's summary, he indicated that Ms. Son told him that she interpreted Joshua Stewart's statement about "business" to mean a drug deal. (Pl.'s Add'l S.M.F. ¶ 37.) During her deposition, Ms. Son explained that she formed this belief after the stabbing occurred. (Pl.'s Add'l S.M.F. ¶ 35.) Ms. Son specifically denied forming that belief when the men left the store. (Pl.'s Add'l S.M.F. ¶ 35; Son Depo. at 53.) Detective Lucier's summary is consistent with Ms. Son's sworn testimony and does not generate an issue of fact.

After they exited the store, Ms. Son saw the men briefly walk back and forth in front of the store, and then begin to walk toward their vehicle. (Pl.'s Add'l S.M.F. ¶¶ 37–38; Def.'s Opp. to Pl.'s Add'l S.M.F. ¶ 37; Son Depo at 59.) Ms. Son believed that they had left the premises. (Supp. S.M.F. ¶ 22.) She did not call 911 at this time. (Pl.'s Add'l S.M.F. ¶ 39.) Ms. Prevatt made her second trip to the dumpster around this time, and saw John Stewart and James Curit outside the store. (Pl.'s Add'l S.M.F. ¶ 46.) Ms. Prevatt thought they appeared "wasted," but did not believe they were acting suspiciously. (Pl.'s Add'l S.M.F. ¶ 47; Def.'s Opp. to Pl.'s Add'l S.M.F. ¶ 47; Prevatt Depo. at 41.)

On her third trip outside, Ms. Prevatt saw a white Jeep parked in the back of the store parking lot. (Supp. S.M.F. ¶ 38.) While at the dumpster, Ms. Prevatt heard a loud argument and screaming from the area of the Jeep. (Supp. S.M.F. ¶ 40; Pl.'s Add'l S.M.F. ¶ 49.) Seconds later, she saw people run from the Jeep towards the store. (Supp. S.M.F. ¶ 40; Prevatt Depo. at 48, 77.) Ms. Prevatt testified that she did not attempt to disrupt the argument because she did not have time to do so. (Pl.'s Add'l S.M.F. ¶ 49; Def.'s Opp. to Pl.'s Add'l S.M.F. ¶ 49; Prevatt Depo. at 48, 77.)

One of the people running from the Jeep was Allen Bennison. (Supp. S.M.F. ¶ 43.) By the time Ms. Prevatt reentered the store, Mr. Bennison was already inside lying on the floor and Ms. Son was on the phone calling for help. (Supp. S.M.F. ¶¶ 43–44.) He had been stabbed. (Supp. S.M.F. ¶ 53.) Ms. Prevatt ran to get towels to put on Mr. Bennison's chest wounds, and she and Ms. Son applied pressure to the wounds until help arrived. (Supp. S.M.F. ¶ 55.) Neither Ms. Prevatt nor Ms. Son knew Allen Bennison, nor did they know that he was on the premises before the stabbing occurred. (Supp. S.M.F. ¶¶ 36–37, 39.)

4

At the time of the stabbing, Mary Beth Stewart and Joshua Stewart were married but had separated. (Supp. S.M.F. ¶ 45.) Ms. Stewart had become engaged to Mr. Bennison and the two were living together. (Supp. S.M.F. ¶ 46; Pl.'s Add'l S.M.F. ¶ 93.) Joshua Stewart and Allen Bennison were acquainted and knew of each other's relationship with Ms. Stewart. (Pl.'s Add'l S.M.F. ¶ 48.) However, Ms. Stewart had seen Joshua on the day of the stabbing and had downplayed her relationship with Mr. Bennison because she was concerned that Joshua was suicidal. (Supp. S.M.F. ¶¶ 47, 49; Pl.'s Add'l S.M.F. ¶¶ 92, 96.)

The evidence shows that on the night of the stabbing Ms. Stewart drove Mr. Bennison to the rear of Airport Variety so that he could complete a drug deal with James Curit and John Stewart.[4] (Supp. S.M.F. ¶¶ 27, 46; Stewart Depo. at 4, 7–8, 13–14.) They had repeatedly called Ms. Stewart to set up a deal. (Pl.'s Add'l S.M.F. ¶ 94.) Ms. Stewart and Mr. Bennison intended to sell the drugs and then go to a local restaurant for dinner. (Supp. S.M.F. ¶ 32.) Ms. Stewart drove her Jeep behind Airport Variety

---

[4] The plaintiff contests this assertion with two pieces of evidence and one legal argument. First, in her own deposition the plaintiff testifies that Mary Beth Stewart called her the day after the stabbing to confess that "[t]hat it was her fault . . . because . . . she set it all up. . . . [T]hey were there just to beat him up and someone threw Josh a knife." (Pl.'s Add'l S.M.F. ¶ 50; Dalzell Depo. at 49.) Ms. Stewart allegedly said that she knew it was going to happen, and that she took Mr. Bennison "there so that he could get beat up." (Pl.'s Add'l S.M.F. ¶ 50; Dalzell Depo. at 49–50.) This is clearly hearsay and is inadmissible as substantive evidence. It would be admissible at trial for the limited purpose of impeaching Ms. Stewart's testimony. However even if the plaintiff is correct and Ms. Stewart did say those things, they are not inconsistent with Ms. Stewart's testimony that Mr. Bennison went to Airport Variety to sell drugs. Ms. Stewart could have agreed to bring him to the drug deal, and then created a set-up by telling Joshua Stewart where Mr. Bennison would be. The evidence does not controvert the defendant's assertion.

The second piece of evidence is the testimony of the victim's brother, Donald Bennison, III. Donald Bennison testified that he had never seen Allen Bennison use drugs and did not know him to sell drugs. (Bennison Depo. at 14.) The witness can only testify to his knowledge, and the fact that he did not know Allen Bennison to use or deal drugs does not controvert Ms. Stewart's testimony that she drove Mr. Bennison to the store so that he could sell drugs. Donald Bennison does not profess any knowledge of the actual events leading up to the stabbing, and his testimony does not controvert Ms. Stewart's.

Finally, the plaintiff cites the statutory presumption that the deceased was acting with due care to rebut the implication that he was engaged in illegal drug trafficking at the time of his death. 14 M.R.S. § 160 (2009). The presumption relates to contributory negligence and does not stand for what the plaintiff claims, i.e. that the court must presume that Mr. Bennison did not go to Airport Variety to engage in illegal activity.

because both she and Mr. Bennison wanted to avoid detection. (Supp. S.M.F. ¶ 29.) They knew that employees would be able to see them in front of the store, and that there were cameras there. (Supp. S.M.F. ¶¶ 30–31.) They did not want to be seen or filmed while dealing drugs. (*See* Supp. S.M.F. ¶ 29.) Neither Mr. Bennison nor Ms. Stewart entered the store prior to the stabbing. (Supp. S.M.F. ¶ 33.)

Shortly after Mr. Bennison and Ms. Stewart arrived, the altercation ensued. It occurred partially in the Jeep, as only Joshua Stewart was standing outside. (Supp. S.M.F. ¶ 41.) Joshua stabbed Mr. Bennison while he was seated in the vehicle. (Supp. S.M.F. ¶ 42.) After being stabbed, Mr. Bennison exited the Jeep and entered the store where the employees phoned 911 and provided first aid. (Supp. S.M.F. ¶¶ 53–55.)

Plaintiff Nancy Dalzell, Mr. Bennison's mother and personal representative, initiated this suit on behalf of his estate on December 16, 2008. The complaint alleges that the store's negligence caused Mr. Bennison's death, and seeks to recover for wrongful death, pain and suffering, and survival actions pursuant to 18-A M.R.S. §§ 2-804, 3-817 (2009). The defendant moves for summary judgment, alleging that it owed Mr. Bennison a minimal duty of care as a trespasser, or that the events leading to his death were not reasonably foreseeable under the circumstances.

## DISCUSSION

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653, 655. A motion for summary judgment must be supported by citations to record evidence of a quality that would be admissible at trial. *Id.* at ¶ 6, 770 A.2d at 656 (citing M.R. Civ. P. 56(e)). An issue of "fact exists when there is sufficient evidence to require a fact-finder to choose between competing versions of the truth at trial." *Inkell v. Livingston*, 2005 ME 42, ¶ 4,

6

869 A.2d 745, 747 (quoting *Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 2, 845 A.2d 1178, 1179). "Summary judgment is appropriate even when concepts such as motive or intent are at issue, . . . if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Dyer v. DOT*, 2008 ME 106, ¶ 14, 951 A.2d 821, 825 (quoting *Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007)).

The plaintiff claims that Airport Variety negligently breached a duty it owed Mr. Bennison, proximately causing the fatal stab wounds inflicted by Joshua Stewart. The court's initial concern is defining the existence and scope of the alleged duty. "The common-law test of duty is the probability or foreseeability of injury to the plaintiff." *Brewer v. Roosevelt Motor Lodge*, 295 A.2d 647, 651 (Me. 1972).

Generally "[a] possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public *while they are upon the land for such a purpose*" if they are assaulted by a third person, the possessor "'has reason to anticipate such assault, and fails to exercise reasonable care under the circumstances to prevent the assault or interfere with its execution.'" *Kaechele v. Kenyon Oil Co., Inc.*, 2000 ME 39, ¶¶ 8, 10 n.5, 747 A.2d 167, 170 (quoting *Brewer*, 295 A.2d at 651; citing *Restatement (Second) of Torts* § 344 (1965)) (emphasis added). However, this rule applies "only while [a person] is on the part of the land to which [the] invitation extends—or in other words, the part of the land upon which the possessor gives him reason to believe that his presence is desired for the purpose for which he has come." *Collomy v. School Admin. Dist. No. 55*, 1998 ME 79, ¶ 7, 710 A.2d 893, 895 (quoting *Restatement (Second) of Torts*, § 331 cmt. 1 (1965)) (quotations omitted). When a member of the public "enters or remains upon" the possessor's land for a purpose wholly unrelated to the possessor's business "without a privilege to do so created by the possessor's consent or otherwise," that person is a trespasser. *Id.* ¶ 6, 710 A.2d at 895 (quoting *Restatement (Second) of Torts*,

7

§ 329 (1965)) (quotations omitted). The only duty owed a trespasser is "to refrain from wanton, willful or reckless behavior." *Cilley v. Lane*, 2009 ME 133, ¶ 15, 985 A.2d 481, 486 (citing *Collomy*, 1998 ME 79, ¶ 15, 710 A.2d at 897).

"Trespass in a negligence suit . . . is a threshold issue," and "is not an affirmative defense." *Id.* ¶ 13, 985 A.2d at 486. "Perhaps the most important single consideration in determining such status is the purpose for which the injured party came upon the defendant's premises, since in order to" be owed a duty of care, "that purpose must coincide to some degree with the express or implied 'invitation' which the defendant extended." R.W. Gascoyne, Annotation, *Status of Once Who Enters a Store or Other Place of Public Resort Solely for Purposes of Using Facilities Accessible to Public, Such as Telephone, Mailbox, Lavatory, or the Like*, 93 A.L.R.2d 784 (2008). The uncontroverted evidence shows that Mr. Bennison was on Airport Variety's premises for private, illegal reasons entirely unrelated to the possessor's business purposes. Airport Variety is a retail convenience store and gas station that sells small consumable goods to the public. It only has one entrance, located in the front of the building where it is visible to the store's employees and is monitored by security cameras. This configuration precludes most legitimate business from occurring behind the store, and the presence of the dumpster indicates that this rear area was reserved for use of the possessor and its employees.

Mr. Bennison and Ms. Stewart purposefully went to the area behind Airport Variety for the express purpose of avoiding the store's employees and evading the store's security measures, such as the cameras positioned at the store's entrance. They did this because they intended to engage in illegal activity on the defendant's premises, without the defendant's permission. The evidence shows that Mr. Bennison and Ms. Stewart intended to complete or at least participate in a drug deal, and that Ms. Stewart

8

may have had the additional purpose of setting up the attack on the victim. Airport Variety had no reason to expect that its patrons would actively circumvent its security to engage in illegal activity well beyond the business purposes for which they were invited. This covert and illicit activity clearly brands Mr. Bennison as a trespasser.[5] *See Poulin v. Colby College*, 402 A.2d 846, 851 n.5 (Me. 1979) ("[A] landowner . . . has no reason to expect a trespasser's presence," so "a trespasser has no basis for claiming extended protection.")

The plaintiff disputes this characterization on the grounds that Mr. Bennison's purpose for being on the defendant's property should be irrelevant when determining his legal status as a trespasser. There is no question "that business entrepreneurs have a strong commercial interest in attracting to their premises members of the general public having no preexisting and consciously formulated intention of engaging in an immediate business transaction . . . ." R.W. Gascoyne, *supra*. The Law Court essentially recognized this principle in *Poulin v. Colby College* when it abolished the distinction between invitees and licensees and held that a landowner owes a duty of reasonable care "to all persons *lawfully* on the land." 402 A.2d at 851 (emphasis added). However, the Court retained the classification of trespasser, i.e. one who is unlawfully on the landowner's premises and whose presence, while theoretically foreseeable, is unexpected. *Id.* at 851 n.5; *see Bonney v. Canadian Nat'l Ry. Co.*, 800 F.2d 274, 275–76 (1st

---

[5]     The plaintiff argues that Mr. Bennison might have purchased something from Airport Variety after he finished his business behind the store, and that this potentiality prohibits the court from ascertaining his status as a matter of law. Any such inference would be pure conjecture. There is no evidence that Mr. Bennison had any legitimate purpose on the premises that evening. To the contrary, the testimony indicates that he and Ms. Stewart intended to leave the premises and go to dinner after selling the drugs. Even if he had intended to engage in legitimate business following the drug sale, it would not alter the analysis. When Mr. Bennison was behind the store for illegal purposes wholly unrelated to the business purpose for which the defendant opened its premises to the public, he was beyond his bounds. *See Collomy*, 1998 ME 79, ¶ 7, 710 A.2d at 895 (quoting *Lewis v. Mains*, 150 Me. 75, 77–78, 104 A.2d 432, 434 (1954)). He would have regained the protections afforded to non-trespassers when he abandoned his illicit purposes and conformed his behavior to that expected of a legitimate business patron.

9

Cir. 1986) (person who fell from railway trestle was a trespasser despite defendant's knowledge that the public often used the bridge without permission). It is critical that Mr. Bennison had no lawful purpose for being on Airport Variety's premises, rendering him a trespasser.

"To entitle a trespasser to recover for an injury, he must do more than show negligence. It must appear that a wanton or intentional injury was inflicted on him." *Cilley*, 2009 ME 133, ¶ 15, 985 A.2d at 486 (quoting *Foley v. H.F. Farnham Co.*, 135 Me. 29, 35, 188 A. 708, 712 (1936)) (quotations omitted). The plaintiff alleges that the defendant's negligence consisted of its failure to install security cameras behind Airport Variety, and possibly a failure to provide adequate lighting. Even if negligent, these failures hardly rise to the level of wanton and willful conduct. Landowners are not generally required to make their premises safe for trespassers, particularly if the so-called dangerous condition is "open and obvious, and fully appreciated by the trespasser." *Bonney*, 800 F.2d at 277 (citing *Lewis v. Mains*, 150 Me. 75, 76–77, 104 A.2d 432, 434 (1954); *Stanley v. United States*, 476 F.2d 606, 609 (1st Cir. 1973)). Here, Mr. Bennison and Ms. Stewart actively sought out the rear of the store to take advantage of the lack of security cameras and relatively low visibility. Mr. Bennison's representative cannot now complain that those measures were inadequate to protect him.

The plaintiff also contends that the defendant's employees negligently failed to call the police after Joshua Stewart asked about security cameras and made a comment about "business to take care of," or after they observed John Stewart and James Curit loitering in the parking lot. The court first notes that the employees could not have foreseen Mr. Bennison's presence behind the store or the risk Joshua Stewart posed to him based on the behavior of the three men in the store. (*See* Supp. S.M.F. ¶ 26; Greene Depo. at 58–59 (plaintiff's expert stating that Ms. Son could not have anticipated

10

violence).) The only foreseeable threat at that point was to the store's property or to the employees themselves, and the employees properly told the men to leave.

When the men appeared to leave, the employees had no reason to call the police. Even when Ms. Prevatt saw John Stewart and James Curit a short time later, the evidence does not show they were engaging in behavior that would prompt a call to the authorities. There is certainly nothing to indicate that she should have called the police to make the premises safe for an unforeseeable trespasser like Mr. Bennison. Even more so, when one considers that Mr. Bennison is the one who sought out John Stewart and James Curit. However, even if the employees' failure to contact the police was negligent, it did not breach the duty owed to a trespasser. The defendant and its employees did not affirmatively create the danger to Mr. Bennison by instigating the drug deal or the dispute, nor did they "commit any act that led to his initial injury." *Cilley*, 2009 ME 133, ¶ 15, 985 A.2d at 486. The defendant did not breach any duty it owed Mr. Bennison as a trespasser.

**The entry is:**

The undisputed record shows that Mr. Bennison was a trespasser, and that the defendant did not breach its duty to refrain from wanton, willful, or reckless conduct against him. The defendant's motion for summary judgment in its favor is granted.

DATE: _10/4/10_

G. Arthur Brennan
Justice, Superior Court

ATTORNEY FOR PLAINTIFF:
PETER CLIFFORD
HODSDON & CLIFFORD
56 PORTLAND RD
KENNEBUNK ME   04043

ATTORNEY FOR DEFENDANT:
DAVID HERZER, ESQ.
NORMAN HANSON & DETROY
PO BOX 4600
PORTLAND ME   04112-4600